# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### December 17, 2013 Session

## STATE OF TENNESSEE v. JESSICA KENNEDY

**Appeal from the Criminal Court for Monroe County**
**No. 11058    Walter C. Kurtz, Senior Judge**

---

**No. E2013-00260-CCA-R3-CD - Filed July 30, 2014**

---

The Defendant, Jessica Kennedy, was convicted by a Monroe County Criminal Court jury of facilitation of felony murder, a Class A felony, facilitation of aggravated robbery, a Class C felony, facilitation of burning personal property, a Class A misdemeanor, and facilitation of abuse of a corpse, a Class A misdemeanor. *See* T.C.A. §§ 39-13-202, 39-13-402, 39-14-303, 13-17-312, 39-11-402, 39-11-403 (2010). The trial court sentenced the Defendant as a Range I, standard offender to concurrent sentences of twenty-two years for facilitation of felony murder, five years for facilitation of aggravated robbery, eleven months, twenty-nine days for facilitation of burning personal property, and eleven months, twenty-nine days for facilitation of abuse of a corpse. On appeal, she contends that (1) the evidence is insufficient to support her convictions, (2) the trial court erred by denying her motion for a judgment of acquittal, (3) the trial court erred by denying her motion to suppress, (4) the trial court erred by failing to grant a mistrial related to the testimony of Tennessee Bureau of Investigation (TBI) Special Agent Barry Brakebill, (5) the trial court erred by permitting the State to call witnesses not listed on the indictment, (6) the trial court erred by making improper statements related to her recorded police interview and by failing to grant a mistrial, (7) the trial court erred by limiting the testimony of a psychologist, (8) the trial court erred by denying her *ex parte* motion for funds to secure an expert, (9) the trial court erred by overruling her motions to dismiss and to disqualify the prosecutor and the district attorney general's office, and (10) the trial court erred by misapplying mitigating and enhancement factors during sentencing. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

John E. Eldridge, Knoxville, Tennessee, for the appellant, Jessica Kennedy.

Robert E. Cooper, Jr., Attorney General and Reporter; Kyle Hixson, Assistant Attorney General; Steven Bebb, District Attorney General; and James H. Stutts and Steve Morgan, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the shooting death of Jim Miller, who was shot, his body placed in the trunk of his car, and his car set on fire.

### Suppression Hearing

At the suppression hearing, TBI Special Agent Danny Fay testified that he was a licensed polygraph examiner and that he witnessed two of the Defendant's interviews. He said that on October 25, 2010, she told him that she might be pregnant and that he deemed her medically unfit to undergo a polygraph examination. He said that on November 10, the Defendant was not pregnant, initially consented to a polygraph examination, and ultimately changed her mind. He said the Defendant asked to return to her cell and to speak with Detective Brannon. Agent Fay permitted her to speak with Detective Brannon. Agent Fay said that when the Defendant was leaving the room to return to her cell, she said that she had been involved in a homicide. He said he was present during the interview but denied creating a report. He said Special Agent Brakebill and Detective Brannon were present but was unsure if Agent Melton and the prosecutor were present.

Michael Trabeler testified that he was a law student and worked for defense counsel. He said that at counsel's direction, he researched the media reports related to this case. He said that on July 22, 2010, the Knoxville News Sentinel published a story quoting District Attorney General Steven Bebb, which stated that the victim had been "shot in the back of the head, two in the front." Mr. Trabeler said that based on the articles and the online comment section, he concluded that multiple rumors circulated in the local community about who could have killed the victim. He said that on July 19, the News Sentinel published an article stating, "Investigators are tight lipped, rumors are flying, the community is shocked by the discovery . . . of a body." Likewise, on July 24, the News Sentinel published an article quoting Jim Anderson, "You hear everything but the ham frying, every kind of story and some of them you just know . . . can't be true." Mr. Trabeler said that in the comment section on the News Sentinel's website on July 22, people commented that the victim's death was a Dixie Mafia "hit" and that the Ku Klux Klan was involved.

Mr. Trabeler testified that the News Sentinel reported on July 20, 2010, Kenny Hope was being investigated. He said the comment section of the online article showed

discussions that the police were involved in the victim's death and that Mr. Hope took care of the sheriff's business. He said that on July 21, the comments showed that some people believed the victim's death was a political assassination. He recalled an article reporting that Ronnie Helton was being investigated and that threats were made against a TBI witness. On January 7, 2011, one comment on the News Sentinel website stated, "Jim Miller's family doubts slaying inquiry." Mr. Trabeler said that "some reliable sources" told him the victim's brothers had been in and out of jail for "dealing," although the sources did not know if the victim had been involved. He said that after November 2010, the articles stopped until the Defendant was indicted. He said that the News Sentinel published seventeen articles between July 2010 and January 2011 and that he found others from the Monroe County Buzz, WBIR.com, and WATE.com.

On cross-examination, Mr. Trabeler testified that as an undergraduate student at the University of Tennessee, he took more than ten journalism classes and worked for the Tennessee Journalist, an online School of Journalism publication. He agreed he found about thirty-one articles related to the victim's death. He said that he found twenty-four articles dated before November 10, 2010. He agreed the volume of articles was not unusual given that the victim was found burned in the trunk of his car and was a public figure. He agreed that he could not determine who submitted online comments or if the comments came from Monroe County residents. He said, though, the victim's daughter submitted numerous comments.

Retired TBI Special Agent Barry Brakebill testified that he interviewed the Defendant on November 10, 2010, at the Monroe County Sheriff's Office. He said Doug Brannon, Danny Fay, and the prosecutor were also present. He advised her of her *Miranda* rights and said she did not ask for an attorney or "indicate" that she did not understand her rights. The Defendant signed a waiver of rights form. He said the Defendant did not state that she had a medical condition that would prevent her from understanding the form.

Special Agent Brakebill testified that his investigation began with Tiffany Sullivan. He learned that Ms. Sullivan and the Defendant were arrested on unrelated charges, that Ms. Sullivan called a family member expressing a desire to get out of jail, and that Ms. Sullivan said during the call that she knew information about the victim's killing. He talked to Ms. Sullivan, who said the Defendant told her where the killing occurred. He denied Ms. Sullivan was afraid of the Defendant but said Ms. Sullivan feared law enforcement generally. Ms. Sullivan agreed to wear a recording device but showed the device to the Defendant.

Special Agent Brakebill testified that he interviewed the Defendant on July 26, 2010, at a local restaurant and said the Defendant provided handwritten notes about Boonie Stokes

and Brandon Steel,[1] which resulted in their arrests on unrelated charges. He agreed Mr. Steel and Mr. Stokes probably knew the Defendant provided information resulting in their arrests.

Special Agent Brakebill testified that after the Defendant provided her notes, he searched for guns, took photographs, and canvassed a neighborhood based on where the Defendant said the killing occurred. He said that around October 13, 2010, he received a telephone call from Detective Brannon, who said the Defendant wanted to talk to them. He was unable to attend the interview, but Detective Brannon spoke to the Defendant. Detective Brannon told him that the Defendant placed herself at the scene at the time of the killing and said she helped place the victim inside the trunk. Special Agent Brakebill asked Agent Josh Melton to obtain a written statement from the Defendant.

Regarding the November 3 or 4, 2010 interview, Special Agent Brakebill testified that he took the Defendant to the crime scene, which was video recorded. He agreed he repeated what he thought the Defendant previously stated regarding the murder. He agreed her statement at the scene was different from what she told TBI Agent Melton and from her October 13 statement. He agreed that each time the Defendant was interviewed, her story changed, that she divulged additional information, and that she placed different people at the scene. He said he took the Defendant to a location in which she thought the gun was buried.

Special Agent Brakebill testified that he did not prepare the written summary of the Defendant's November 10, 2010 interview. He said that a recording was made every time the police talked to the Defendant, except their conversation at the local restaurant. He said TBI policy was not to record interviews and agreed he did not expect Agent Melton recorded their conversation. He agreed the Defendant wanted to move from the visitation booth but denied telling her that he would move her if she told him what he wanted to hear.

Special Agent Brakebill testified that he did not recall if he read the Defendant her *Miranda* rights during the July 26, 2010 interview. The November 10, 2010 statement was played for the trial court. Special Agent Brakebill testified that the Defendant was in police custody and that she asked if he placed the hold on her. He agreed he did not read the Defendant her *Miranda* rights, although she discussed methamphetamine and marijuana. He agreed Monroe County Sheriff Bivens was in the room, although he was not seen in the recording. He agreed he wanted the Defendant to know she could tell him if a law enforcement officer was involved in the killing. He agreed that the Defendant and Mr. Steel were in a relationship at the time of the interview and that the Defendant said she feared Mr. Steel, although she returned to Mr. Steel after she was released from custody. He agreed the

---

[1] The record shows the spelling as "Brandon Steele" and "Brandon Steel." We have used the spelling provided at the trial, "Brandon Steel."

Defendant said she feared Mr. Stokes. He learned the Defendant, Mr. Steel, and Mr. Stokes were confined to the Monroe County Jail and said he told the Defendant that he could keep her safe before asking her where the murder occurred.

Special Agent Brakebill testified that he investigated the Defendant's claim that the killing occurred at the yellow house but denied that the area was examined for forensic evidence. He said Sweetwater Police Officer John Scruggs went to the location before the interview and found the house. He agreed he asked the Defendant about the motive for the killing. He agreed that the Defendant implicated Sheriff Bivens and former officer Mike Morgan in the killing and that he did not question the Defendant further about her statement. He agreed Mr. Morgan participated in the early stage of the investigation. He agreed that he said to the Defendant, "We've heard rumors that [the victim] had sex with some girl" and that she provided the name of someone she thought could have been involved with the victim. He agreed the Defendant said Mr. Stokes stated, "You should have seen the look in his eyes when I pulled the trigger." He did not recall if he heard the same information from others.

Special Agent Brakebill identified his notes from the October 13, 2010 interview. Because of poor audio quality, the recording of the October 13 interview was received as an exhibit but not played for the trial court. The court stated that before it reached a decision on the motion, it would listen to each recording. Special Agent Brakebill agreed he did not read the Defendant her *Miranda* rights because they were not required and said the Defendant was only a witness to overhearing Mr. Steel's and his friends' statements when he initially talked to her. He knew she was under arrest but said the arrest was for unrelated offenses. He did not ask if the Defendant had an attorney. He agreed the Defendant said that she overheard Mr. Stokes, Mr. Steel, Alex Lance, and Travis Nipper talking about the killing and that she overheard Ms. Sullivan talking about the murder when they were confined in the Monroe County Jail. He said the Defendant heard that the murder occurred on Creek Road behind Mr. Stokes's farm. He agreed the Defendant said that the victim paid and permitted Ms. Sanchez to stay at his trailer in exchange for sex. He agreed Ms. Sanchez told the Defendant this information.

Special Agent Brakebill testified that after the Defendant was released from custody, she provided him with contact information and said she was staying with Robert Johnson, who he learned was "a local source of information." He said officers talked to him if they wanted to know what was going on in the community.

Special Agent Brakebill testified that on November 4, 2010, he took the Defendant to the yellow house and that a re-enactment was recorded. He agreed that the Defendant consistently denied knowing the victim and that Mr. Steel was not mentioned in this

interview. He agreed the Defendant identified "Shadetree" as being involved in the shooting and said Shadetree was interviewed by the police. He said the Defendant stated that no cars were there, that Shadetree and Ronnie Johnson took the victim's car to Mr. Stokes's house, that she and Mr. Stokes walked to Mr. Stokes's house, and that they "spent some time shaking dope." He agreed the Defendant claimed Mr. Stokes told her, "Don't be another loose end." Special Agent Brakebill agreed he told the Defendant to "try to point us in the right direction" and said he believed the Defendant's version "to some extent." He said he did not tell the Defendant that the police had performed polygraph examinations on people whom the Defendant identified as being involved in the killing and that those people did not show signs of deception.

Special Agent Brakebill testified that in the November 4, 2010 recording, the Defendant said she had been read her rights. He said the Defendant was read her rights each time she was questioned as a suspect. He said that by the November 4 statement, he concluded she was at least an accessory to the murder.

Special Agent Brakebill testified that on November 10, 2010, the Defendant provided a version of events that differed from her November 4 statement. He agreed that in her November 10 statement, the Defendant stated that "it was going to be a robbery," which was planned by Mr. Steel. He agreed that she did not mention Shadetree and Mr. Johnson in this statement and that she said Mr. Steel provided her a .38 caliber revolver. He agreed the Defendant stated that she had never met or had sexual relations with the victim. He said the Defendant helped put the victim into the trunk of the car. He agreed she said Shawn Corn picked her up because "they" left her at the scene. He agreed TBI Agent Fay, the prosecutor, and Detective Brannon were present for the November 10 interview. He said that in one interview, the Defendant said that Mr. Steel placed a gun to her head and told her to shoot the victim.

Upon examination by the trial court, Special Agent Brakebill testified that the Defendant was not a suspect until after November 3, 2010. He said he received a telephone call from Detective Brannon and told him to talk to the Defendant in his absence. Detective Brannon told him that the Defendant knew about the shooting, was present during the killing, and helped place the victim's body inside the trunk of the car. He agreed that between July and November 3, the Defendant was in and out of confinement on unrelated charges and a violation of probation warrant.

Ellen Wilburn testified that she worked as a correction officer at the Monroe County Sheriff's Office from August 2008 to January 2012. She said that the Defendant had been confined to the Monroe County Jail since October 29, 2010, and that the Defendant was placed in C Hold, a visitation holding cell in the main hallway of the jail. The inmate

-6-

movement records only documented the Defendant's placement at the jail from November 3, 2011 to September 27, 2012, and she could not explain why records were missing.

Officer Wilburn testified that the visitation booth in which the Defendant was held was "five by six," had a partition wall in the center and two stools but no running water or a toilet. She thought the Defendant was housed in the visitation booth for about two weeks. Based on the jail records, she said that on November 3, the Defendant was in C Hold, a visitation booth, that she was moved to A Hold, another visitation booth, on November 5, and that later on November 5, the Defendant was moved to "the drunk tank." She said the records showed that on November 9, the Defendant was returned to C Hold, a visitation booth, and later returned to the drunk tank. Although the records did not show how long the Defendant was in the drunk tank, she was moved to the general population on November 10. She agreed the records showed that from November 3 to November 10, the Defendant was in isolation.

Officer Wilburn testified that Mr. Steel was an inmate when she worked at the jail and that he was confined to the jail from October 29 to November 10. She agreed she escorted the Defendant down the hallway where Mr. Steel was housed. She said that Mr. Steel beat on the door and screamed at the Defendant that she "had better keep her mouth shut," that "he was going to hurt her," and that "there [were] people who were watching her." She said she only heard rumors about what Mr. Steel told the Defendant to keep her mouth shut. She said the threats were continuous until he was transferred to another facility in October 2011. She agreed Mr. Steel cursed the Defendant and said the Defendant told her that she did not feel safe at the jail. She said Mr. Steel knew he was in jail because of the Defendant. Ms. Wilburn reported her concerns to her superiors but was told not to move the Defendant. She said she heard other inmates say that the Defendant "was having problems."

Officer Wilburn testified that the Defendant told her she was afraid someone was going to kill her and hurt her family. She denied telling the sheriff about the Defendant's fears. She said that when the Defendant returned from the police interviews, she was always crying and upset.

On cross-examination, Officer Wilburn testified that the Defendant said she was afraid of Mr. Steel. She agreed the Defendant and Mr. Steel lived together. She agreed Mr. Steel was in jail on drug-related charges and a probation violation. When asked if Mr. Steel's "harassment" of the Defendant occurred before November 10, 2010, she said Mr. Steel would have harassed her "anytime he had an opportunity" because his cell was adjacent to her holding cell. She denied that inmates' yelling was unusual. She did not know when Mr. Steel arrived at the jail.

Officer Wilburn testified that in October 2010, the jail could house about twenty-six to twenty-eight female inmates. She denied that female inmate overcrowding prevented the Defendant from being removed from the visitation booth. She never saw the Defendant sleeping, which was unusual because most inmates slept during the day. She said the officer moving an inmate was responsible for logging an inmate's movements.

Upon examination by the trial court, Officer Wilburn said the Defendant was placed in the visitation booth because she had an "administrative hold, a detective hold." She said the hold required the Defendant to be separated from other inmates. She thought Mr. Steel was in the main jail until September, October, or November 2011. She said that after Mr. Steel was moved from the main jail, the problems ended.

On redirect examination, Ms. Wilburn testified that she recalled an incident when Mr. Steel broke out of his cell and ran into the Defendant's cell. She said she did not recall the details of how Mr. Steel entered her cell but said he was removed from it. She said the incident occurred after November 10, 2010.

TBI Agent Jason Legg testified that on November 29, 2010, he interviewed the Defendant at the Meigs County Sheriff's Office and that the video recording of the interview was forwarded to Special Agent Brakebill. He said that although he discussed the recording with the prosecutor the morning of the suppression hearing, the prosecutor did not ask for the recording. The recording was received as an exhibit.

Monroe County Sheriff's Detective Conway Mason testified that he participated in some of the Defendant's interviews, although he did not recall the dates and did not take notes. He said his purpose was to be a witness to the interview. He said he was responsible for bringing the Defendant to the sheriff's office on one occasion. He said he and Mr. Morgan picked up the Defendant from her stepfather's house one evening and thought Mr. Morgan called the Defendant before they picked her up. He said he did not get out of the police truck when they arrived at the house. He did not know what, if anything, Mr. Morgan said to the Defendant before they entered the truck. He did not recall taking the Defendant home after she was interviewed or Mr. Morgan's telling the Defendant that she was in a lot of trouble. He said they had a casual conversation during the drive to the sheriff's office. He recalled being present for two of the Defendant's interviews. He did not recall if Walt Hunt or Travis Jones was present during the interview.

Detective Mason testified that he participated in the re-enactment at the yellow house. He did not recall who drove the Defendant to the scene. He said Mr. Morgan was the captain of the detectives who might oversee or assist in an investigation. He said the district attorney's office requested the TBI lead the investigation rather than Mr. Morgan, although

he denied knowing the reason for the request. He said Mr. Morgan left the sheriff's office around December 2011 or January 2012.

Monroe County Sheriff's Captain Travis Jones testified that he participated in the November 3, 2010 interview and that Detective Brannon and Correction Officer Teresa Fleek were also present. He said that he took notes during the interview, that the notes were in the case file, and that Detective Brannon led the interview. When asked about his notes, he said "Kenny" referred to Mr. Hope. He said the Defendant stated that Mr. Nipper "rode and got stung with Kenny Hope." He agreed the Defendant stated that Mr. Johnson told her that Mr. Hope was mad at the victim. He said that by that time, Mr. Hope had been cleared of any involvement in the killing. He did not recall being present during an October interview but said he would not dispute the recording. He denied that it was unusual to obtain ten statements from a suspect, although he had never interviewed a suspect ten times. He said he provided Detective Brannon his notes and summary of the interview. He denied knowing anything about the re-enactment. Upon examination by the trial court, Captain Jones testified that he did not recall who initiated the November 3 interview but said that Detective Brannon asked him to join the interview.

TBI Agent Josh Melton testified that he interviewed the Defendant on November 4, 2010, and that he went to the yellow house earlier that day. He recalled taking the Defendant to a barn where she thought the gun was placed. He denied finding the gun or taking notes. He did not know who owned the property. He said that after they left the property, he interviewed the Defendant and presented his file to counsel. He said Sheriff Bivens was present during the interview. He said he asked the Sheriff not to record the interview because he believed it made people nervous and because he normally did not record interviews. He took notes and provided the signed narrative of the interview to counsel.

Agent Melton testified that the Defendant provided different accounts of the murder during the re-enactment and her November 4 interview. He agreed that during the re-enactment, the Defendant said she was on the porch of the yellow house, saw the victim arrive, and saw Mr. Stokes and Mr. Corn sneak up behind and shoot him.

Walt Hunt testified that in July 2010, he was an investigator for the district attorney general's office. He said that he was involved in the investigation and that his notes were submitted to the TBI's "main unit file." He said he participated in two of the Defendant's interviews, although he did not recall the dates. He denied taking notes during the interviews. He said the prosecutor, Detective Brannon, Special Agent Brakebill, and Sheriff Bivens were also present during the interviews in which he participated. Although he said he had interviewed suspects ten times, it was not the general rule. When asked, "[T]he more

you interview[,] the less reliable" a statement is, he said, anecdotal evidence might show a relationship but that he could not prove or disprove it.

Monroe County Sheriff Bill Bivens testified that he knew the victim vaguely but did not know him personally. Sheriff Bivens denied taking any notes during his participation in the investigation. He did not know whether the Defendant was told her interviews were recorded. He agreed that Mr. Morgan participated initially in the investigation and that he was probably present during the early interviews. He said he asked District Attorney General Bebb for assistance in the investigation but denied the request was motivated because some of his officers were implicated in the killing. He said the TBI cleared Mr. Hope of involvement. He recalled the Defendant said she heard that he and Mr. Morgan were involved. He said that Mr. Morgan was never interviewed and that he did not see a reason to interview him.

Sheriff Bivens testified that the Defendant's jail movement records before November 3 should exist. He agreed that counsel requested the Defendant be transferred to another jail and said that he refused to move her because his office had done nothing wrong. He was worried about giving the impression that his office was guilty of wrongdoing. He knew Mr. Steel was in the jail and of his relationship with the Defendant. He denied knowing she was afraid of Mr. Steel but said she told him she was afraid of Mr. Steel. He reviewed the jail records and said the Defendant was placed in a visitation booth from November 3 to November 10. He agreed the visitation booths did not have running water, a toilet, or a bed. He said the jail was overcrowded, and it was common for inmates to sleep on mats. He agreed the Defendant was a person of interest after October 29, 2010.

Upon examination by the trial court, Sheriff Bivens testified that he did not know why the Defendant was housed in a visitation booth from the end of October to November 10. He denied a detective hold would explain the Defendant's housing in a visitation booth. He said that the hallway was monitored by video camera, that officers checked on the inmates every thirty minutes, and that the inmates were given water and allowed to use a restroom. When asked if the Defendant would have been permitted to leave the cell for exercise, he said jail staff would know.

Monroe County Sheriff's Lieutenant Josh Woods testified that he possessed the Defendant's jail records. He agreed the Defendant did not receive any visitors in 2010 and received her first visitor on February 9, 2011. He said that although the Defendant's telephone calls were recorded, he did not have a log showing with whom she spoke. He said no record was compiled showing when a detective might take an inmate out of the jail. He said the Defendant's jail movement records showed that the first entry was on November 3, 2010, when the Defendant was placed in a visitation booth. He said it was possible the

information for October 29 through November 3 was entered incorrectly. He agreed the records showed that on November 5, a notation was entered stating that the TBI wanted her separated from other inmates. The Defendant's visitation records were received as an exhibit.

Monroe County Sheriff's Detective Douglas Brannon testified that his first contact with the Defendant was her July 26 or 27, 2010 interview. He provided all his notes and materials from the investigation to Special Agent Brakebill. He denied secretly recording the Defendant and said the camera was in plain view. He said he did not take notes during the interview. He agreed some of his conversations with the Defendant were not recorded but said those conversations were "casual."

Detective Brannon testified that he talked to Ms. Sullivan in October 2010 but that he was not involved in Ms. Sullivan's wearing an electronic recording device. He denied participating in the July 30 or 31 interview, a recording of which was received as an exhibit. He agreed the Defendant said Ms. Sullivan and Mr. Nipper took her to the woods at Mr. Stokes's house and told her where the victim was killed. He agreed the Defendant said that Ms. Sullivan was scared because "important people" were involved and that Ms. Sullivan said Mr. Morgan and Sheriff Bivens were involved. He said the Defendant did not want to be around Mr. Morgan. He agreed the Defendant said Mr. Stokes and Mr. Nipper were hired by Mr. Morgan and Sheriff Bivens. He agreed the Defendant said Ms. Sullivan heard Mr. Stokes say, "You should have seen the look in his eye when I shot him." He agreed the Defendant expressed fear of Mr. Steel several times.

Detective Brannon testified that at the time of the killing, rumors implicated many people in the killing. He said they investigated Mr. Hope's involvement and determined that he was incorrectly accused of saying, "I shot him and burned him like the pig he was." He said someone named Toffer was implicated in the killing. He said eleven interviews were not unusual and noted the Defendant volunteered or requested to talk to law enforcement numerous times. He agreed the Defendant called him Doug and said he wanted her to be comfortable talking to him. He said that the Defendant mentioned Mr. Corn's involvement first and that the Defendant changed her story numerous times regarding Mr. Corn.

Detective Brannon testified that he led the November 1, 2010 interview, that the Defendant mentioned Mr. Hope and Frankie Howell, and that the Defendant denied shooting the victim and said she was "geeked out," causing the days to run together. He agreed the Defendant stated that she thought Mr. Stokes killed the victim and that Mr. Stokes "rode up on it." He agreed the Defendant named Mr. Stokes, Becky Vires, Mr. Hope, and Mr. Howell and said Mr. Steel mentioned seeing Mr. Stokes, Mr. Nipper, and Mr. Lance on the road near the burn site.

-11-

Detective Brannon testified that he next interviewed the Defendant on November 3, 2010. The video recording, the detective's notes, and the summary were received as exhibits. He agreed that in the November 3 interview the Defendant implicated Mr. Stokes, Mr. Johnson, and Shadetree in the murder and identified Mr. Stokes as the shooter. He agreed the Defendant told multiple stories regarding the murder but said she consistently placed herself and Mr. Stokes at the scene. He said the Defendant's statements regarding Mr. Steel's presence at the scene varied.

Detective Brannon testified that he and FBI Agent Clay Anderson spoke to the Defendant on January 6, 2011, and that the interview was not recorded. His notes were received as an exhibit. When asked whether the Defendant received *Miranda* warnings on July 26, July 30 or 31, October 13, October 25, and November 1, 2010, he said that if no warnings were given, it was because the Defendant initiated the conversation and because at the time, she was an "informational witness," not a suspect. He did not recall if he told the Defendant that she was not required to talk to the police. He said that Mr. Johnson was Mr. Steel's uncle. He denied knowing the Defendant was held in isolation at the jail and said the interview rooms were located across the street from the jail. He said the jail staff took the Defendant to and from the jail.

Detective Brannon testified that he knew Mr. Stokes and Mr. Steel were in the local jail on unrelated charges when the Defendant was there and that the Defendant provided information leading to their arrests. He agreed the charges were related to Mr. Stokes's having sexual relations with a fourteen-year-old girl and to Mr. Steel's manufacturing methamphetamine. He denied having knowledge of Mr. Steel's threatening the Defendant and agreed the Defendant said she was scared of Mr. Steel at times. He said they had a love-hate relationship.

Detective Brannon testified that he investigated cases involving Todd Sweet and John Edward Dawson but denied knowing if the cases were dismissed because of "misdeeds" of Monroe County Sheriff's detectives. He agreed he worked with Patrick Henry, who was accused of impersonating an attorney to Mr. Sweet. When asked if he participated in the meeting with Mr. Henry and Mr. Sweet, he said he met the defendant but did not participate in the "illusion." He agreed he saw the false stationery prepared for the illusion but said he saw it after the fact. He agreed, though, he impersonated a member of the mob and purported to be Mr. Sweet's contact in the mob organization.

Detective Brannon identified a document describing a list of things that occurred during the first few hours of the investigation. He said the document did not have TBI or Monroe County Sheriff's Office letterhead and denied seeing it before counsel provided it.

He denied that the Defendant appeared intoxicated during the interviews when she was not in custody but said it was possible she was intoxicated.

Detective Brannon testified that he concluded that the Defendant always provided "a kernel of truth" about the victim's killing and about unrelated matters. He denied, though, that the Defendant told the police what they wanted to hear. He agreed that at times, she provided information freely and at others, she argued with the officers. He agreed the Defendant was interviewed numerous times and said his goal was to determine the truth.

Upon examination by the trial court, Detective Brannon testified that the Defendant returned to custody late in October because of a probation violation. He denied knowing the Defendant was housed in isolation and said he usually did not enter the jail to talk to suspects. He said his interviews were conducted across the street. He agreed a detective hold was placed on the Defendant and explained the hold was to prevent the Defendant from talking to other inmates but denied requesting she be held in isolation. He said, too, the hold was instituted because of the Defendant's pending Meigs County charges.

On cross-examination, Detective Brannon testified that the Defendant was booked into the Monroe County Jail on October 29, 2010, at 4:27 p.m. He said the booking sheet showed that the Defendant was charged with failure to appear and stated, "Do not release - Meigs County." He said she was later transferred to Meigs County before she was indicted for the victim's murder. He said Mr. Hope was investigated and cleared of involvement. He agreed the Defendant said she heard Mr. Hope made statements about how he shot the victim in the chest. He said the autopsy showed the victim was shot in the head. He agreed he thought the Defendant's statement about Mr. Hope was false. He said Adam Toffer was investigated because the Defendant said Mr. Toffer met the victim in the parking lot at the Dinner Bell, stuffed the victim in the trunk of the car, and drove away. He said it was alleged Mr. Toffer stabbed the victim and cut up his body before setting it on fire. He said the allegation was unsupported by the investigation. He denied telling the Defendant that he could help with her pending charges, threatening her with new charges if she failed to cooperate, or threatening to interfere with her bond.

On redirect examination, Detective Brannon testified that he spoke to Jim Plemmons during the investigation. He denied Mr. Plemmons told him that he heard Mr. Hope confess to shooting the victim three times in the head. He said he interviewed Brenda Stakely but denied she told him that Mr. Hope confessed to shooting the victim execution style. After reviewing notes, he stated that Mr. Plemmons said Mr. Hope confessed to "[a] general execution type and then put him in the trunk and burned him like the pig he was." He agreed Ms. Stakely provided the same information.

-13-

TBI Agent Jason Legg was recalled by the defense and testified that he interviewed the Defendant at the Meigs County Jail. He said that although he did not take notes, he provided a copy of the recording to Special Agent Brakebill. He said he thought the interview occurred on November 29, 2010. The recording was played for the court. He said his supervisor told him to interview the Defendant, which occurred in his office at the Meigs County Sheriff's Office. He said it was his idea to tell the Defendant that he did not think she killed the victim and that she did not have the gumption to kill the victim. He said the man who entered his office was Detective Scotty Wiggins, who had a rapport with the Defendant. He said he thought the Defendant told the truth during this interview but thought the statement was self-serving.

**Trial**

At the trial, TBI Special Agent Barry Brakebill testified that on July 17, 2010, he responded to the crime scene to assist the "State Bomb and Arson Division." He saw a car burned beyond recognition. He said that the officers extinguished the flames and that the car was moved to the Monroe County Sheriff's Department. He said that the victim was found inside the car and that he attempted to determine who last had contact with him.

Special Agent Brakebill testified that about one week after the victim was found, he received a telephone call from a Sweetwater Police detective, who said Tiffany Sullivan and the Defendant were in police custody on unrelated charges and had information related to the victim's death. He learned from Ms. Sullivan that several people who were involved in the victim's death came to the Defendant's house, a few hundred yards from the scene, and that the Defendant overheard them talking about the killing. He testified consistently with his suppression hearing testimony regarding Ms. Sullivan's wearing a recording device.

Special Agent Brakebill testified that the Defendant resolved her unrelated charges, was released from custody, and spoke to him numerous times about the victim's death. On one occasion, the Defendant contacted him and provided him two pages of notes. He said the Defendant was not a suspect at that time. He said the Defendant was arrested again on unrelated charges in October or November 2010 and asked to speak with him and Monroe County Sheriff's Detective Doug Brannon. He testified consistently with his suppression hearing testimony regarding his inability to attend the interview, Detective Brannon's interviewing the Defendant, and the Defendant's placing her herself at the murder scene and helping place the victim's body in his car by bending his legs. He said the Defendant was interviewed again the following day by TBI Agent Josh Melton.

Special Agent Brakebill testified that at some point after Agent Melton interviewed the Defendant, the Defendant was transferred to the Meigs County Jail, that the Defendant

talked to other inmates about the victim's killing, and that the inmates reported the information to the correction officers. He said the correction officers contacted local TBI Agent Jason Legg, who interviewed the Defendant at the jail some time after November 10, 2010. He agreed that during these interviews, the Defendant identified numerous people who were involved in the victim's killing. He interviewed the people the Defendant identified and verified any potential alibis. He agreed that the investigation of the victim's death was still an open case and that nobody had been charged with murder.

Special Agent Brakebill testified that the last police interview in which he participated occurred on November 10, 2010. He said that this interview occurred after the Defendant placed herself at the scene, that the Defendant was a suspect by that time, and that the interview was recorded. He said the Defendant was advised of her rights, was provided drinks, snacks, and bathroom breaks, and did not request an attorney. He agreed the Defendant "implicate[d] herself more fully in the robbery and the homicide." The video-recorded November 10 statement was played for the jury.

In the recording, the Defendant was advised of her rights after being provided a drink and candy. The Defendant admitted to shooting the victim and said Mr. Steel planned to rob the victim. She denied robbing the victim and said she did not know if anything was taken. She said Mr. Steel was about $130 short on their monthly rent. She said Mr. Steel provided her the .38 caliber revolver used in the killing. The special agent told her the victim was shot three times in the head. She said she was scared.

When confronted with her previous statement to TBI Agent Josh Melton in which the Defendant stated that someone else was the shooter, she admitted she was untruthful. She said she weighed about 135 pounds at that time and agreed the victim was a big man. She said that she helped place the victim's legs inside the trunk. She agreed she had consistently stated that she helped place the victim's legs inside the car. She said that after the victim was killed, "they" left her at the scene and that "Shawn" returned for her.

The Defendant said that when she helped put the victim's feet inside the car, Mr. Steel and Mr. Corn helped place the victim's upper body in the trunk. She said that after the victim was shot, she had blood on her face and clothes, which were later burned. Special Agent Brakebill mentioned that the Defendant called Mr. Steel's uncle, Robert, and told him that Robert knew the gun's location. She said Mr. Steel buried the gun near a barn.

The Defendant stated that Mr. Corn knew she was going with Mr. Steel to the location where the killing occurred and that Mr. Steel was going to rob a man while there. She said Mr. Steel mentioned the robbery earlier that day. She said Mr. Steel did not like Mr. Corn

because she had an affair with Mr. Corn. She began to cry and said she did not know how to leave Mr. Steel.

The Defendant said that just before the killing occurred, the victim saw Mr. Steel. She said Mr. Steel got mad at her, although she did not know why. She said that Mr. Steel gave her the .38 caliber revolver, that he threatened her with a .32 or .45 caliber pistol, and that he wanted her to kill the victim. She mentioned Mr. Steel shot at her previously with a .22 caliber gun. She said that Mr. Steel stood behind her and that the victim told her she did not have to do this. She said "Garrett" was there, but she did not know where.

After being reminded of a previous statement, she recalled the victim wore "slacks" and a ring. She said the victim touched her face and said, "You're a pretty young thing." She said Mr. Steel was not within hearing distance. She said the victim knew to come to that location because Mr. Steel and Michael Garrett arranged it. She identified several people from photographs and cried when shown a photograph of Mr. Corn.

The special agent mentioned that in a previous statement the Defendant falsely said Mr. Stokes made a phone call to someone who she thought was the victim and said he had Becky [inaudible]'s "new young little meat." She said she first heard Becky's name from Mr. Steel. She was shown a photograph of Becky but did not recognize her. When asked if she had important information, she said that she did not know, that she played her "own part," and that she had to serve time for her part.

On cross-examination, Special Agent Brakebill testified that in the recording the Defendant said Mr. Steel was present during the killing, that Mr. Steel provided the gun and that the killing occurred at the yellow house. He agreed he told the Defendant that the victim was shot three times but said the Defendant already knew the number of times the victim was shot. He agreed the Defendant denied knowing about the victim's rings, and he said one of the victim's rings was missing when his body was found. He agreed that the victim wore his watch at the time of his death and that any cash in the victim's wallet burned during the fire. He agreed the Defendant said she was left at the scene and sent a text message to Mr. Corn requesting he pick her up. He said that the Defendant did not leave with anyone who was at the scene and that Mr. Corn picked up the Defendant. He agreed that Mr. Corn took his own life sometime later, although he did not know when, and said the Defendant believed Mr. Steel was involved in Mr. Corn's death. He agreed that the Defendant said Mr. Steel put a gun to her head, gave her a .38 caliber revolver, and told her to shoot the victim.

Special Agent Brakebill testified that Ms. Sullivan wore the recording device on July 26, 2010, and the recording was played for the jury. In the recording, the police officers told Ms. Sullivan to ask the Defendant where the Defendant hid the gun. The officers wanted Ms.

Sullivan to take the Defendant aside and ask if she told the police if a gun was still out there, and if so, where it was. The police told her to ask if the Defendant was present during the killing and why the victim was killed. Ms. Sullivan said the Defendant mentioned previously a .38 or .380 handgun, and Ms. Sullivan was told that the Defendant hid the gun. The detective said he only wanted to ensure the Defendant was not involved in the killing.

In the recording, Ms. Sullivan said, "Listen," which was followed by static. Ms. Sullivan said she wondered how the killing occurred and asked what the Defendant told the police. The Defendant said she told the police the truth as she knew it. The Defendant said that she told the police about the yellow house in the woods and that the victim's car was down the road from her and Mr. Steel's house. She said that on the morning of the shooting, "Travis" brought "him" back home around 10:00 a.m. because Conway Mason was "down the road." Ms. Sullivan asked if the Defendant knew where the gun was, and the Defendant said that she knew the gun's location "indirectly" and that she was not "putting herself out there" anymore than she already had. The Defendant said it made her sick that she and Ms. Sullivan were in jail, although they did not commit the murder. The Defendant mentioned that the police were going to drop the hold on her but had not yet dropped it.

Ms. Sullivan asked the Defendant what she told the police. The Defendant said she told the police that Mr. Steel disappeared for three nights and that after the third night, "Travis" brought Mr. Steel home around 10:00 a.m. She said that Mr. Steel had taken the ".38 black metal" gun from the couch and returned with a different gun. She said Mr. Stokes buried the gun. She said Mr. Steel told her that he was on a four-wheeler. The Defendant expressed anger with Mr. Steel for getting her involved. She said that Mr. Steel obtained a new tire and rim for his Mercury Marquis when he was gone for the three days. She thought Mr. Steel and Mr. Stokes "did it." She said that when Mr. Steel returned home, he took a shower, took some shells for his gun, and left.

The Defendant stated that she could give the police enough information to justify taking Mr. Steel into custody and holding him until the police determined what occurred. She discussed the abuse she suffered from Mr. Steel and said she had had enough of it. Ms. Sullivan said she did not know the victim was "the Jim" with whom "Kristen" stayed. The Defendant said she just "put it together." The Defendant said she never met "Jim." Ms. Sullivan said she wondered if Jim was looking for Kristen and found out too much. The Defendant said Jim paid Kristen's rent but was married to another woman.

Ms. Sullivan pressed the Defendant about the gun's location, and the Defendant said she did not know the gun's specific location. She said that one of the guns was "put up at the house" but that she was not going to provide the police all the information and remain in confinement.

Ms. Sullivan said she feared Mr. Stokes, and the Defendant said she thought Mr. Steel and Mr. Stokes killed the victim. She said Mr. Stokes had a conscience because she heard him talking in his sleep and having nightmares after the killing. She did not think Mr. Nipper was involved directly. Ms. Sullivan asked if she had seen Kristen, and the Defendant denied seeing her for some time. She said that Mr. Steel had an affair with Kristen when the Defendant and Mr. Steel were together and that she threw a soda can at Mr. Steel's head.

Ms. Sullivan asked if the Defendant had anything to do with the killing, and the Defendant denied any involvement. The Defendant said she was "locked in that . . . house" just like she was "locked in this . . . cell." They discussed "Marty" dying at a party, and the Defendant said she did not know how he died or how his death related to Mr. Steel, Mr. Stokes, Mr. Nipper, Kristen, and the victim. She said she thought that Mr. Steel knew she was getting ready to leave and had some money saved, that Mr. Steel wanted to find Kristen, and that Kristen did not want a relationship with Mr. Steel because she had the victim, who gave her anything she wanted. She thought Mr. Steel and Mr. Stokes "made it happen." The Defendant said that the victim must have truly cared for Kristen, although she slept with other people.

The Defendant said that if the police wanted to know the whereabouts of the gun, they would have to help her. She said that she knew one gun was at the house and that she knew the general location of the other. She said she thought "they" shot the victim in the head once on the first night, left him sitting outside the second night until they could determine what to do, and put him in the car and set it on fire the third night. She said someone came to her house looking for Mr. Steel when he was gone, waited a couple hours, and left when Mr. Steel did not return. The Defendant said that she wanted to help the police but that she had to look out for herself and her three children.

Special Agent Brakebill testified that he placed no value in the Defendant's comments. He said that minutes after the recording ended, the Defendant was brought into an interview room, and the police obtained a search warrant for Mr. Steel and the Defendant's house. He agreed that the Defendant wanted to provide information regarding the victim's killing in exchange for her release, that she said Mr. Steel had a gun, and that he obtained a search warrant based on her information. He said a gun was found at the house.

Special Agent Brakebill testified that the district attorney general's office asked him to participate in the investigation but denied that he was asked to participate because a member of the Monroe County Sheriff's Office was involved in the killing. He agreed, though, that Lieutenant Kenny Hope was implicated in the early stage of the investigation but said the information was unverifiable.

Special Agent Brakebill testified that the Defendant contacted him and provided text messages sent to her from Mr. Stokes, which were used in part to obtain an arrest warrant for Mr. Stokes on a sex-related offense. He said the Defendant may have stated that she was abused sexually as a child.

Special Agent Brakebill testified that his first interview of the Defendant occurred on July 25, 2010, and the video-recorded interview was played for the jury. In the recording, the Defendant said she knew he wanted to talk about "Jim Miller." She expressed fear of Mr. Steel. Special Agent Brakebill asked the Defendant to tell him the truth about the victim's death, and she asked, "What are you going to do for me?" He asked what she wanted, and the Defendant wanted to go home, get her belongings, and leave Mr. Steel. She wanted him to remove the hold, and he said he would if she cooperated. She said Mr. Steel cheated on her with a fourteen-year-old girl, shot at her, and beat her.

When asked about the victim's death, the Defendant said the killing occurred near the yellow house she shared with Mr. Steel. She said Mr. Steel disappeared for three days and when he returned home, he told her "they found him burning." She said Mr. Steel took his .38 caliber handgun before he left home "in case something happened." She said that Mr. Steel and Mr. Nipper returned home around 10:00 a.m., that Mr. Steel saw "Conway" down the road, and that Mr. Steel thought Conway was going to search their house for methamphetamine manufacturing materials. She said that Mr. Steel had a gun when he returned home but that it was not the .38 caliber he took from the home three days previously. She said that Mr. Steel said they needed to bury the .38 caliber he took from the home because Mr. Stokes had done "something" but that he did not go into details. She said that Mr. Steel asked for shells and that she gave him all the shells. She said Mr. Steel was convicted previously of shooting his stepmother and "a Mexican." She said Mr. Stokes was previously convicted of rape and murder.

When asked if she knew where the gun was buried, the Defendant said she knew the "general whereabouts of the direction they went" when they left to bury it but denied seeing them bury it. She said she overheard Mr. Stokes and Mr. Steel talking about where they were going to bury the gun and about the victim. She said Mr. Stokes shot and set the victim's body on fire.

The Defendant said Mr. Stokes drove a white Ford truck. She thought they buried the gun in the same place Mr. Stokes buried jewelry he took from the woman he raped and killed years previously. She said Mr. Stokes gave her a piece of jewelry after he was released from prison, although she denied having a sexual relationship with him. She said Mr. Stokes attempted to convince her to leave Mr. Steel. Although she could not provide details, she thought the killing had to do with money, Mr. Morgan, and Mr. Hope. When asked if Mr.

-19-

Stokes said he killed the victim, she said he told her, "You should have seen the look in his eyes when I pulled the trigger." She said Mr. Steel and Mr. Nipper were present during the killing. She said she overheard Mr. Stokes and Mr. Steel when she was outside feeding her roosters.

The Defendant discussed Mr. Steel's drug use, which included methamphetamine and pills. She admitted periodic methamphetamine use. She denied knowing the motive for the killing but said she heard Mr. Steel say he owed the victim "a bunch of money." Special Agent Brakebill told the Defendant he heard rumors that the victim was having sexual relations with a woman and that the victim was killed over jealously. The Defendant asked Sheriff Bivens, who was in the interview room, if he knew Kristen Roberts. She said that "there had been a whole lot of talk about her and Mike Morgan" and that Ms. Roberts could have been the girl sleeping with the victim.

The Defendant told Special Agent Brakebill that he could search the house she shared with Mr. Steel and said he would find methamphetamine manufacturing products. She knew one of Mr. Steel's guns was in the house. She did not know where the .38 caliber handgun and the twelve-gauge shotgun were. She thought they might have been at Mr. Steel's uncle's house. She agreed she did not know if Mr. Steel was involved in the killing.

Special Agent Brakebill testified that the Defendant cried during the interview and told him she wanted to go home, get her belongings, and leave Mr. Steel, who beat her routinely. He agreed the Defendant was afraid of Mr. Stokes. He said he arrested Mr. Stokes and "sent him to prison." He agreed that he asked the Defendant if Mr. Stokes had a reason to kill the victim and that the Defendant said "it had to do with Mike Morgan, had to do with money." He agreed he did not investigate the Defendant's statement. He denied, though, changing the subject each time the Defendant mentioned Mr. Morgan. He agreed the Defendant also mentioned Ms. Roberts and Jennifer Hamilton. He agreed he told the Defendant he heard rumors that the victim was engaged in extramarital affairs.

Special Agent Brakebill identified a map of a portion of Monroe County and identified the location of the yellow house where the killing occurred and the location where the victim's body and car were found. He agreed the name Ellington was mentioned during the investigation but did not know if anyone investigated the name.

Special Agent Brakebill testified that he completed the investigative reports each time the Defendant was interviewed. He agreed the Defendant's next interview was July 30, 2010, after she was released from custody. He said the Defendant requested the meeting, and the video-recorded interview was played for the jury. In the recording, the Defendant stated

that Mr. Steel's uncle, R.L., showed her where the victim was burned and that she had been there previously with Mr. Stokes and "Shadetree." She said she had never met the victim.

In the recording, the Defendant stated that when she and Ms. Sullivan were in custody together, Ms. Sullivan told her Mr. Stokes took Ms. Sullivan to the woods behind his house, identified the area where "they" killed the victim, and showed her where the victim's body was set on fire. She said Mr. Stokes told Ms. Sullivan this information to scare her. She said Mr. Stokes had been arrested four times since the murder but was not in confinement. The Defendant began to cry and said she did not want to go back to a cell.

A detective told her that Ms. Sullivan claimed the Defendant told Ms. Sullivan about where the killing occurred and where the victim's body was set on fire. The Defendant said Ms. Sullivan was scared and knew more about the killing than the Defendant. She said Ms. Sullivan told her about the recording device as soon as Ms. Sullivan entered the cell. She said Ms. Sullivan was afraid of Mr. Morgan, although the Defendant did not know if Mr. Morgan was involved. She said Ms. Sullivan stated that Mr. Nipper told Mr. Stokes "to do it" but did not know why. She said she and Ms. Sullivan were separated before Ms. Sullivan could explain. She asked them not to put her back in confinement just for her to find out the reason.

When asked about the piece of jewelry Mr. Stokes gave her, the Defendant removed a ring from her finger and gave it to the detectives. She said that after Special Agent Brakebill asked about it during their last conversation, she looked for it because she thought the detectives would want it.

The Defendant said the gun Mr. Steel took from their house was a black .38 caliber revolver. She recalled one incident in September when Mr. Steel shot at Mr. Stokes inside their previous house. She said Mr. Stokes bought the gun from Mr. Steel for about $100. She said she did not know how Mr. Steel and Mr. Stokes got from the shooting location to where the victim's body was set on fire.

The Defendant said that Mr. Stokes mentioned to her that he was accused of having a conversation with Mr. Nipper when Mr. Stokes and Mr. Nipper were inside one of the "out buildings" where she and Mr. Steel lived. She said Mr. Stokes accused her of telling the police that Mr. Stokes and Mr. Nipper had the conversation. She told Mr. Stokes that "he was crazy" and that she did not know Mr. Stokes and Mr. Nipper had ever met. She said she first learned about the alleged conversation when Mr. Stokes mentioned it. She said it was as though Ms. Sullivan was telling the Defendant what occurred but telling Mr. Nipper the information was coming from the Defendant. She said that the day she and Ms. Sullivan were arrested was possibly the day Mr. Stokes and Mr. Nipper had the conversation. She

said that she had known Mr. Stokes for about three years, that Mr. Stokes had a soft spot in his heart for her, and that Mr. Stokes had falsely told Mr. Steel she was unfaithful. She said Mr. Stokes caused relationship problems for her because he wanted to date her.

The Defendant denied talking to Mr. Nipper and said Ms. Sullivan told her Mr. Stokes told Ms. Sullivan that she should have seen the look in the victim's eyes when he shot the victim. She denied she was present when the statement was made. She said the information she was providing came from her "being on the streets."

The Defendant said Mr. Stokes and Mr. Nipper came home around 10:00 a.m. the day the victim's body was found. She said the "word" was that Mr. Stokes and Mr. Steel killed the victim because they were hired by Mr. Morgan and Sheriff Bivens. She speculated that it was possible Mr. Stokes and the victim "had business together."

The Defendant said that Mr. Steel took a .38 caliber gun from their house and that three days later when he returned, he had a different .38 caliber gun. When asked if she thought all revolvers were .38 calibers, she said Mr. Steel told her the guns were .38 calibers. She said that after Mr. Steel returned home, he smoked "a joint," left the house, and ran out the side gate of their property. She said Mr. Steel was wearing camouflage pants that morning. She denied seeing Mr. Steel recently but said he sent her a text message. She said the police were not going to find Mr. Stokes because he was scared.

When asked if she knew why they left the victim's body where it was found, she said she did not know if Mr. Nipper told Ms. Sullivan. She said she did not know the extent of Ms. Sullivan's knowledge because they were separated when they were in jail.

The Defendant said that several months before the murder, Mr. Stokes and she were driving around, that Mr. Stokes drove to the area were the victim's body was burned, and that they threw out tires from the back of the truck. When asked why she stayed with Mr. Steel when he physically abused her, she said that she could not help that she loved him. She admitted telling Mr. Stokes that he would be sorry, although she was afraid of him. She recalled an incident when Mr. Stokes kissed her and said she became angry. She said she and Mr. Stokes had a "love-hate relationship." She said Mr. Stokes had "street smarts."

The Defendant denied that Mr. Steel would talk to them about the victim's death and said that he would rather go to prison or have someone else go to prison than admit what he did. When asked if she could find out Mr. Steel's involvement, she said she believed he was directly involved. She denied involvement in the killing.

When the special agent confronted her with rumors that Sheriff Bivens and Mr. Morgan were involved in the killing, the Defendant said she did not believe Sheriff Bivens was involved. She stated that she learned about the murder from Ms. Sullivan and that she thought Ms. Sullivan was too smart to have been involved in the killing. She said she received a text message from Mr. Stokes mentioning "Trav," from which she concluded that Mr. Stokes and Mr. Nipper knew each other. She said only Mr. Nipper's friends called him Trav. She said Mr. Nipper had a blue F-150.

The Defendant said that Mr. Steel's clothes were bloody when he returned home after three days. She did not know if the camouflage pants he wore were still at their house. She said the blood was on his clothes from his chest down. She denied Mr. Steel's hands were bloody and denied seeing blood on Mr. Stokes. She gave the detectives permission to return to her house.

Special Agent Brakebill testified that at the July 30 interview, the Defendant provided her handwritten notes, which were received as an exhibit. Special Agent Brakebill read a portion of the notes, which stated that Mr. Nipper had abused Ms. Sullivan but that Ms. Sullivan was the only person arrested on domestic-related charges. Mr. Nipper was later arrested three times, and Mr. Nipper became angry with Ms. Sullivan. The notes stated that Mr. Nipper

> took [Ms. Sullivan] to Head Creek and showed her the woods behind Boonie Stokes' house and told her that's where he had taken Jim Miller. . . . [A]ccording to Travis, Boonie Stokes then shot him in the head, standing by his . . . trunk. . . . [Mr. Nipper] took her to his home and drove her . . . to [the] location Jim Miller's car was discovered burning. He then told her that's where they burnt Jim Miller and the car. He told her that he was telling her this to warn her.

In the notes, the Defendant stated that Ms. Sullivan was not safe in any correctional facility "controlled by" Sheriff Bivens, Mr. Morgan, or their families. The Defendant stated that the house, pond, and wooded areas at Head of Creek needed searching because this was Mr. Stokes's "safe place," although Mr. Stokes's friend "Shadetree" probably helped Mr. Stokes leave the state. The Defendant stated that Mr. Stokes's girlfriend's mother's property needed searching.

Special Agent Brakebill testified consistently with his suppression hearing testimony regarding allegations that Mr. Hope claimed to have killed the victim and the victim's wife receiving a telephone call from an unknown man threatening to kill the victim. He stated that the Defendant and Mr. Steel had a four-year relationship, that the Defendant was afraid of

Mr. Steel, and that he did not believe the Defendant was prevented from leaving Mr. Steel. When presented with his testimony from a pretrial hearing, he agreed he testified previously that the Defendant said Mr. Steel told her continuously that he could "get" to her.

Special Agent Brakebill testified that at the time of the killing, Mr. Morgan was the captain of detectives for the sheriff's office but denied that the Defendant said Mr. Morgan was involved in the killing. He said the Defendant stated that Mr. Morgan "was sleeping with some people." When presented with his testimony from a pretrial hearing, he agreed he testified previously that the Defendant said "the sheriff and Mike Morgan" were involved in the killing. When asked at the trial if he investigated Sheriff Bivens and Mr. Morgan, he said no information implicated them in the killing.

Special Agent Brakebill testified that Ms. Sullivan told him her information came from the Defendant, although the Defendant identified Ms. Sullivan as her information source. When presented with a portion of his investigative report, he agreed the report showed that Ms. Sullivan told Detective Scruggs she learned about the killing from Gene Ellington, Mr. Nipper, and others. He agreed the report showed that Ms. Sullivan said Mr. Ellington told her and Mr. Nipper that the victim was shot in the head and burned. He agreed he did not interview Mr. Ellington and said he did not know if another investigator interviewed him. He agreed he was the primary custodian of the file and said he did not know if he received a report from another officer regarding Mr. Ellington.

Special Agent Brakebill testified that the Defendant was next interviewed on October 13, 2010, and that the interview was video recorded, which was played for the jury. In the recording, the Defendant said she was sober and no longer using drugs. The Defendant stated that she was pregnant and that Mr. Steel attempted to run over her with a car the previous day. She said that Jill Coker was her sister-in-law's sister and that Jackie Kennedy was Ms. Coker's sister. Special Agent Brakebill told the Defendant that Ms. Sullivan said the Defendant provided Ms. Sullivan's information regarding the murder. Regarding Sunday morning after the murder, she agreed that she was at home with Mr. Steel and that Mr. Lance, Mr. Stokes, and Mr. Nipper came to their house just after daylight in a Toyota truck. She said the men went to one of the outbuildings and talked. She agreed she went to feed her roosters and overheard them talking. She said that at the time, she was "geeked out of [her] mind" and that the sequence of events was cloudy. Special Agent Brakebill "refresh[ed] her memory" by stating "should have seen the look in his eyes," and she completed his statement by saying, "When I pulled the trigger."

The Defendant stated that the murder supposedly occurred behind Mr. Stokes's property and that she learned Ms. Sanchez was present during the killing. She said that the victim paid Ms. Sanchez for sex. She said Ms. Sanchez was at Mr. Stokes's property earlier

the day of the shooting and left Mr. Stokes's property with "Yankee" in his red Chevy Astro van between 8:00 and 10:00 a.m. She said that when they returned, Mr. Nipper, Mr. Steel, and Mr. Stokes arrived.

The Defendant stated that she overheard Mr. Steel, Mr. Lance, and Mr. Stokes talking near one of the outbuildings and that when they were talking, Mr. Nipper was "messing with" one of the dead chickens. On Saturday, Mr. Steel and Mr. Garrett were with her when she was cleaning the house. She agreed Mr. Steel could not have been involved in the murder but said she thought he knew something about it. She said she last spoke with Mr. Steel the previous day. She said she learned the other information about the killing from Ms. Sullivan when they were in jail together.

The Defendant stated that she knew who Ms. Coker was but did not know her well. She said she had never seen the victim until his photograph was in the newspaper after the murder. She said that Ms. Sanchez told her that she had sexual relations with the victim in exchange for money and that the victim allowed women to stay at his house in exchange for sex.

The Defendant was shown a photograph of Tabitha Atkins and told the detectives where she lived. She denied the photograph was of Ms. Coker. She agreed Ms. Sullivan told her that the murder occurred behind Mr. Stokes's house. She said that the day after the murder, she overheard Mr. Stokes say to Mr. Lance and Mr. Steel that they should have seen the look in the victim's eyes when he pulled the trigger. She said Ms. Sullivan showed her the wire almost immediately because Ms. Sullivan did not want all the information coming out when Ms. Sullivan was in jail.

Special Agent Brakebill testified that he was on a "fishing expedition" during the October 13, 2010 interview. He identified the voice of the unseen person as Detective Brannon. He agreed that the Defendant said she was intoxicated during the interview in late July but that he did not think she appeared intoxicated during the October 13 interview. Although he denied the Defendant's demeanor was "chummy" with him and Detective Brannon, he agreed the Defendant helped herself to a drink from the refrigerator and admitted making methamphetamine. He denied reading the Defendant her *Miranda* rights and said that he was not investigating drug-related offenses and that the Defendant was not in police custody at that time. He said the only purpose was to determine who killed the victim. He agreed the Defendant mentioned Mr. Morgan.

Special Agent Brakebill testified that on November 10, 2010, the Defendant was in police custody again and that he interviewed her. He took the Defendant to the yellow house and agreed a recording was made when they were there. He agreed TBI Agent Melton

interviewed the Defendant the same day and prepared a typed statement based on the Defendant's remarks, which the Defendant signed. He agreed that although he was unsure of the dates, the Defendant was later incarcerated at the Meigs County Jail in late November and made statements regarding the victim's death to TBI Agent Legg. He agreed that Agent Legg's interview was video recorded but that he did not provide it to the other investigating officers or the prosecutor. He did not know what happened to the recording.

Knox County Medical Examiner Christopher Lochmuller, an expert in forensic pathology, testified that he performed the victim's autopsy and that the cause of death was multiple gunshot wounds to the head. He said the victim was shot in the left and right sides of the forehead and the back of the head. He said the victim's body was burned fully, and he consulted Dr. Murray Marks, a forensic anthropologist, to identify the victim. The autopsy report was received as an exhibit.

Dr. Lochmuller testified that no gunpowder stippling or soot were found surrounding the gunshot wounds and concluded that the gun used to inflict the wounds was not placed on the skin. He could not determine the distance between the victim and gun. He recovered one small "missile" fragment, two medium missile fragments, and five large missile fragments. He found a laceration to the right side of the victim's forehead and concluded it was caused by blunt force trauma.

On cross-examination, Dr. Lochmuller testified that the car trunk was extremely hot and caused severe damage to the body. He agreed that if the victim possessed any money, it probably would have burned in the fire, unless it was somehow protected from the heat. He said the victim was found face down inside the trunk of the victim's car and agreed he could not determine which gunshot wound was inflicted first. He said that although he expected some blood spatter caused by the gunshot wounds, he concluded the amount of spatter would have been less because no exit wounds were found. He said that a pack of gum, a ring, and a watch were found on the victim during his examination and that he gave those items to the police.

On redirect examination, Dr. Lochmuller testified that the laceration to the victim's forehead was inflicted before the victim died. Upon examination by the trial court, he stated that "several" unfired bullets and empty shell casings were found in the trunk near the victim's body. He agreed that he did not know if the unfired bullets and empty shell casings were related to the victim's killing or were inside the trunk when the victim was placed there.

Madisonville Police Officer Greg Tallent testified that he worked at the Monroe County Sheriff's Department at the time of the victim's death. He said that on July 17, 2010, he was the first officer to arrive at the scene. He said he responded to an unrelated matter

and saw smoke coming from a car fully engulfed in flames and that the car was parked nearby at an old dairy farm. He said that he requested the fire department, that firefighters extinguished the fire, and that the victim's body was found inside the trunk.

On cross-examination, Officer Tallent testified that he found the car around 8:00 p.m. and stayed at the scene until 3:00 a.m. He secured the scene after the victim was found and denied moving the victim's body.

TBI Forensic Technician Susan Clark testified that two "cans" of evidence were submitted to the TBI laboratory for analysis on July 21, 2010, and that the evidence was related to police suspect Brandon Steel. She said that although evidence analyzed might be related to one suspect, the same evidence might be used against another suspect as long as the evidence was analyzed for the same case number.

TBI Forensic Technician Laura Hodge testified that on July 16, 2010, she was assigned to the microanalysis unit where she performed fire debris and gunshot residue analyses. She said she analyzed the two cans of evidence, which contained ash, debris, and charred clothes. She concluded that the substances inside the cans contained the "presence of an evaporated gasoline range product." She said that the product was gasoline, not diesel or paint thinner. Her report was received as an exhibit.

TBI Forensic Technician Steve Scott testified that he worked in the firearms identification unit and that he analyzed the bullets and bullet fragments recovered during the victim's autopsy. He concluded that two of the bullet fragments were consistent with a .38 caliber Smith & Wesson or .357 Magnum. He said that although he could not conclusively exclude a nine-millimeter handgun, it was rare for a nine-millimeter to use the type of lead bullets recovered from the victim's body. He said the lead bullets were consistent with a revolver. He concluded that three bullets were fired from the same gun. He said that the fragments submitted for analysis were small and damaged and that he was unable to match the fragments. He said the markings on the bullets and fragments caused by firing the gun were rounded and large, indicating the gun was older. His report was received as an exhibit.

On cross-examination, Mr. Scott testified that two of the bullets and one of the bullet fragments were fired from the same gun. He agreed that a gun belonging to the victim was submitted for analysis, that he fired the gun, and that he compared the bullet to the bullets and fragments recovered during the victim's autopsy. He concluded that the bullet from the victim's gun and the bullets recovered from the victim's body did not match.

Mr. Scott testified that firearms consistent with a .38 caliber class included a .38 Smith & Wesson, a .38 Special, and a .357 Magnum. He said a .380 caliber was a semi-

automatic handgun. He said that although it was possible for a .380 caliber handgun to use a lead bullet like those recovered from the victim's body, in his twenty-six years of experience, he had only seen one lead .380 caliber bullet. He said most .380 caliber handguns used copper-jacketed bullets.

State Fire Marshal Daniel Foster testified that he and Special Agent Gary Elliot investigated the fire. He said that they went to the scene and obtained general information. He said that he was also a K-9 officer and that he brought his dog, who was trained in detecting ignitable liquid accelerants. He said the dog was trained and certified in detection by the Bureau of Alcohol, Tobacco, and Firearms. The dog responded to the trunk and backseat areas of the car and the ground near the rear of the car, indicating the presence of gasoline. He collected debris samples from the backseat and the trunk for analysis. He identified a photograph of the trunk of the car and identified the location of the victim's body.

On cross-examination, Agent Foster testified that bullets were found inside the car and that bullets exploded in a fire. He identified an evidence release form showing that on January 20, 2012, his office released to the Monroe County Sheriff's Department one watch and two rings belonging to the victim.

State Fire Marshal Don Cogan, an expert fire investigator, testified that he worked in the Bomb and Arson Division and assisted Agents Foster and Elliot in the investigation. He arrived at the scene at 10:30 a.m. on July 18, 2010. He said that Agent Foster led the K-9 investigation and collected evidence and that Agent Cogan wrote the origin and cause report. He said the rear of the car and the trunk had intense discoloration, or burn patterns, indicating the presence of a long, hot fire. The trunk and the rear of the car were stripped of paint, primer, wax, and sealant, and only the metal frame of the car remained. The fire burned the entire car but burned the hottest and longest at the rear and backseat areas. No signs of an external mechanical failure were found.

Agent Cogan testified that heavy oxidation was found in the trunk and backseat areas of the car, which indicated the presence of a hot fire that eliminated the oxygen and water molecules causing rapid rust. He concluded that although the entire car became engulfed in flames, two distinct fires began and later merged. One fire began in the trunk, and the other on the backseat. He concluded that the car was set on fire deliberately. He found keys and a reserve deputy badge inside the car. A copy of his report was received as an exhibit.

Monroe County Sheriff Bill Bivens testified that he saw the victim at a local restaurant a few weeks before the killing and that the victim drove a "police-type" Crown Victoria with a Sheriff's Association medallion on the front license plate. He responded to the scene on

July 17, 2010, and when he walked to the front of the car, he saw a partial license plate in the ash and debris with a Sheriff's Association medallion. He gave the partial license plate number to dispatch and asked dispatch to determine if the numbers matched any portion of the license plate registered to the victim's car. Dispatch matched the partial license plate number to the victim's car.

On cross-examination, Sheriff Bivens testified that he participated in some of the Defendant's police interviews, although he could not recall which interviews. He recalled one occasion when then-Officer Morgan picked up the Defendant from her stepfather's pool and drove her to the police station. Although he did not recall the Defendant's refusing to talk when Mr. Morgan was in the room, he said the Defendant did not like Mr. Morgan.

Sheriff Bivens testified consistently with his suppression hearing testimony regarding the Defendant's confinement in the visitation booth at the Monroe County Jail. Photographs of the booth were received as an exhibit. He denied hearing the Defendant state during the police interviews that she did not want to return to the "cage."

Sheriff Bivens testified that after he realized the victim was Mr. Miller, he called the district attorney general to request an investigator and the TBI. He agreed he knew Mr. Hunt, who was an investigator for the district attorney general's office. He said he "may have" wanted the TBI to lead the investigation because someone from his department was implicated in the killing. He said he "was in the middle of an election as well[.]" He agreed that defense counsel asked him to move the Defendant to another jail because of concerns related to members of his staff and that he denied the request because his office had done nothing wrong.

On redirect examination, Sheriff Bivens testified that at the time of the killing, the Monroe County Sheriff's Office did not have certified arson investigators. He said his conversation with counsel related to moving the Defendant to another jail occurred in 2012, although he did not recall when. He believed the Defendant was safe in his jail. On recross-examination, he stated that the jail contained more inmates than it was certified to house and that some inmates slept on the floor. He agreed there were more than twice as many female inmates than available beds.

Monroe County Sheriff's Detective Douglas Brannon testified that although he was introduced to the victim once, he did not know the victim. He said that a Loudon County Sheriff's Department badge was found in the car and that he learned the victim was an auxiliary officer with the Loudon County Sheriff's Office. He said that he arrived at the scene at 9:00 or 10:00 p.m. on July 17, 2010. He said that although the fire was extinguished, he felt heat and saw smoke coming from the car. He identified photographs

of the scene. He learned a couple weeks after the victim was found that the location where the car was found was not the scene of the killing. He said the murder scene was the yellow house a few miles away. He stated that he and other officers took the Defendant to the yellow house and that the Defendant said the yellow house was where the killing occurred.

Detective Brannon testified that although he did not interview the Defendant in the first weeks after the killing, he participated in some of the Defendant's interviews. He recalled that during the November 10, 2010 interview, the Defendant said the victim was shot with a .38 caliber revolver with a cracked handle and that she provided this information before the firearm analysis was completed. The Defendant also stated that she helped place the victim's legs inside the trunk and that she pushed down the victim's feet. He said that about 200 people were interviewed during the investigation and that no one was omitted intentionally.

On cross-examination, Detective Brannon testified that although he learned the yellow house was the murder scene, he could not recall if that information came from the Defendant or Ms. Sullivan. After having his memory refreshed, he said Mr. Ellington told the Defendant about the murder and where the yellow house was located. Although he did not interview Mr. Ellington, he did not know if another officer interviewed him. He agreed, though, that he had seen nothing in the police file showing Mr. Ellington was interviewed.

Detective Brannon testified that the context in which the Defendant mentioned the .38 caliber revolver was that Mr. Steel had a .38 caliber revolver, not that a .38 caliber was used to kill the victim. He said the Defendant also mentioned Mr. Steel had a .380 caliber handgun inside their home, which was analyzed by the TBI and excluded as the murder weapon.

Detective Brannon testified that the Defendant was in police custody on November 1, 2010, and was interviewed. The video-recorded police interview was played for the jury. In the recording, the Defendant was upset and said, "This should not be happening to me." She was asked if she had talked to "Robert" since she had been in police custody, and she said she had. She said Mr. Johnson knew where the gun was buried. She said she, Mr. Johnson, and her brother Jeffery talked about the gun previously. She said Mr. Johnson did not show her where the gun was buried, and she did not know how he knew its location. She said she did not ask Mr. Johnson any questions because she did not want to know. She said that she was tired of dealing with the victim's murder and that she had been truthful.

The Defendant said that one night she, Jeffrey, and Mr. Johnson sat on the porch, smoked "a joint," and talked. She said Mr. Johnson told her that he had talked to someone who knew where the gun was buried. She began to cry and said that she did not mind

helping the detective but that he "had to do his part" to get her out of jail on the simple possession charge. The detective asked her to tell him "everything," and she responded, "How is that going to help me?"

The Defendant denied involvement in the victim's death. She said that Mr. Johnson told her Mr. Hope, Frankie Long, and Ms. Vires were going out "that night" and that Ms. Vires "wanted out" but they would not let her out. The Defendant denied that it was she who wanted out. She said that Mr. Johnson told her Mr. Hope was bragging that he shot the victim twice in the chest and once in the head. She said Mr. Johnson told her "they" borrowed a van, which she thought belonged to "Sherry."

The Defendant stated that she did not know how Ms. Vires knew Mr. Hope and Mr. Long and that the Defendant only had second-hand information. The detective read the Defendant her *Miranda* rights, and she agreed to talk without counsel. She signed the waiver of rights form.

The detective told the Defendant that he believed she was used and abused and placed in a situation in which she did not want to be. When asked where she was when the killing occurred, she said that she was cleaning her house, that someone dropped off Robert, and that Mr. Lance, Mr. Nipper, and Mr. Stokes arrived. She said Mr. Lance, Mr. Nipper, and Mr. Stokes walked to one of the outbuildings looking for a fuse for Mr. Nipper's car because Ms. Sullivan had removed it. She said she did not know what was going on at that time. She said she received text messages from several family members asking if they were okay because they had been "cookin' dope." Her sister saw the police and thought the police were coming to arrest the Defendant and Mr. Steel because of the drugs. The Defendant said it turned out that the police found the victim's car. She said Mr. Steel left to look for a missing rooster but did not recall when he left.

The Defendant stated that she believed Mr. Stokes, Mr. Lance, and Mr. Nipper killed the victim and that Mr. Steel "knew something," although she did not know the extent of his knowledge or involvement. She said Mr. Steel left to find a missing rooster on Mr. Stokes's property, and she believed Mr. Steel "rode up on it" because it was hours before he returned. She said Mr. Steel and Mr. Garrett passed a red Chevy Astro van on their way to Mr. Stokes's house.

When pressed by the detective about her being present during the killing, the Defendant stated that she only heard about the killing. She said she did not know what happened. She said that Mr. Stokes and Ms. Vires had a sexual relationship. The detective said the story about Mr. Stokes and Ms. Vires "didn't cut it." The Defendant said she thought Mr. Long and Mr. Hope killed the victim. She said Mr. Long threatened her but

minutes later she denied Mr. Long threatened her. She did not know the extent of Mr. Long's involvement and said Mr. Hope killed the victim. She denied knowing where the killing occurred.

The Defendant said that she knew Mr. Hope and Mr. Long picked up Ms. Vires, that somehow the victim ended up with them, and that Mr. Hope shot him. She did not know what gun was used. When asked what time she woke Sunday morning, she said she did not go to bed Saturday night. She said Mr. Nipper and Mr. Steel were "fighting chickens" inside the house on Saturday. She thought that Mr. Steel and Mr. Garrett left and were gone most of the day and that Mr. Steel returned without Mr. Garrett. She said that Mr. Steel obtained a new tire for his Marquis when he was gone and told the Defendant he got a flat tire. She said Mr. Steel left again and returned around 4:00 a.m. Sunday. She agreed that Mr. Steel was gone most of Saturday and said that she thought "they" would hurt her. She knew Mr. Steel would hurt her.

The Defendant said she was not present when the shooting occurred. She said that she did not know the details but that Mr. Johnson knew the details. She said Mr. Steel was "too stupid" to be scared and did not think he could be caught. She said Mr. Steel would not hesitate to shoot Ms. Sullivan. The detective told the Defendant a rumor existed that Mr. Hope was mad at the victim. He asked the Defendant if Mr. Hope did something to the victim, and she responded, "If Kenny did . . . I don't know." She said her information was from other people and denied being involved. She said Ms. Vires was "the bait" and denied knowing the victim. When asked what Mr. Steel got out of killing the victim, she said gratification.

The detective said Mr. Steel told them that the Defendant was present during the shooting and knew what occurred. She said she did not know the victim and did not know what happened. She said Mr. Johnson knew what happened because he was like a son to Mr. Steel. She offered to wear an electronic recording device and talk to Mr. Johnson.

When asked how "they" burned the victim and his car, she said she assumed they used gasoline or some type of fuel. She said she was not given the details. When asked where they got the gas, she said probably from the gas tank. She said Mr. Steel threatened her and told her "not to f--- with it." She said they only cared about themselves. When asked what benefit they received for killing the victim, she said they got paid, although she did not know the amount. She did not know how they got the victim to Mr. Stokes's house. She said the guns were buried and told them to ask Mr. Johnson where.

The Defendant said that she had known Mr. Steel for three years, that he had "something up his sleeve," and that someone was going to get hurt. She denied that the

victim deserved "what he got." She said that Mr. Steel and "the Mexican or the Guatemalan" did "something" with the .380 about one year previously but that she did not know what. A detective unseen from the corner of the room told the Defendant that she was going to be charged with conspiracy to commit murder and that her friends would not protect her when they were interviewed. The detective noted he had heard during this interview twelve different versions of who was involved. She said she had told the truth, and minutes later she said that if Mr. Johnson buried the gun, he buried it near the sawed-off gun Mr. Steel previously buried near a barn.

Detective Brannon testified that the Defendant was placed in police custody on July 25, 2010, and that a forty-eight-hour hold was requested by Clint Brookshire. He agreed Mr. Morgan brought the Defendant to the local jail. Although he denied the Defendant said she feared Mr. Morgan, he agreed the Defendant said she did not like Mr. Morgan. He agreed the Defendant refused to talk if Mr. Morgan was in the interview room. He said the Defendant was released from custody but returned to police custody on October 29, 2010.

Detective Brannon testified that during the November 1, 2010 interview, the Defendant stated she did not want "anything to do with this." He agreed he told the Defendant, "You have been used. You have been abused. You've been put on a spot. These guys used you and they're out strutting like a rooster. It's time to turn the tables." He said the Defendant told many different stories and thought the Defendant could not "keep them straight." He agreed the Defendant claimed at one time that Mr. Stokes and Mr. Steel killed the victim because they were hired by Mr. Morgan and Sheriff Bivens. He agreed he told the Defendant her story was "bulls---." He said that Mr. Corn was mentioned at the end of the interview and that the Defendant became emotional each time Mr. Corn was mentioned.

Detective Brannon testified that two gold rings with diamonds and a watch were recovered from the victim's car. He did not know if the victim wore a third ring. He agreed that if a robbery occurred, the rings and watch were not taken, although they were valuable. He identified a photograph of the Defendant's cell phone, which she provided to Special Agent Brakebill voluntarily. The photograph showed a text message dated July 29 at 1:35 p.m. from Mr. Stokes, which stated, "You may suddenly disappear if you stay here." Another message from Mr. Stokes on July 29 at 1:59 p.m. stated that

> I know you understand. I got to go find her for real, try to save myself. If you ever listen to anything I've said, go on a short vacation, let me deal with this – deal with this s--- here. I can protect you if you let me. I'll be that way tonight sometime if all goes right. I'm saving you a load. LOL. You may be right about it all and everyone, but I will never tell on myself or the part I played in it. I save myself first.

Detective Brannon testified that on November 3, 2010, the Defendant provided her handwritten notes about the night of the killing, which were received as an exhibit. The Defendant's notes stated,

[She] and Bran got in a fight. He left with Garret. Boonie showed up with Shadetree. They were in a van. Ronnie was in the van also. [She] noticed when [she] got in, Boonie argued with [her] bout [sic] [illegible] w[ith] them at first said they had somethin[g] to do. [She] was scared to death to be home when Bran got back. Boonie saw that. We rode out to Boonie[']s - [she] sat in the van smokin[g] a foil when he got there . . . parked behind his trailer. Shadetree, Boonie, and Ronnie had gotten out the van - could hear them in bits & pieces talkin[g] asking Shadetree when "he would be there." Bran & Garrett pulled up - [she] got in the floorboard - stayed ther[e] til Boonie [said] he was gone - that he had wanted to know if Boonie had his gray rooster & Boonie gave him a wheel. Shadetree hollered for Boonie said "he was almost there." Boonie told me to stay in the van that they were goin[g] back to the house he was watchin[g] for "Bo" - he would be back in a few - he had "loose strings to tie up."

[She] sat there w[ith] a strap-to-head geek lite on smok[ing] a foil & decided [she] wanted to take a shot - so [she] got [her] shot ready - got blood pulled back & then heard guy yell "God, No." 3-4 gunshots followed scared [her] so bad [she] bent the needle in [her] arm - still have the perm. bruise. [She] was so scared. [She] sat ther[e] waiting geeked pickin[g] [her] fingernail polish. Boonie out of nowhere - blood spattered on his face & hands got in the van. Ronnie was wit[h] him - Boonie said "we gotta get rid of her" - Don't know where Shadetree was - Boonie told Ronnie they'd drop [her] off at home & pick up T-Bone. T-Bone is what we call Travis Nipper. Boonie took [her] home - and told [her] "don't be another loose string." Ronnie winked at [her] and smiled - [She] got out the van [a little] while later. Trav dropped Tiff off - when he came back he was in Black Toyota & had Alex & Boonie with him.

The Defendant's November 3 interview was video recorded, and although a small portion of the three-hour interview was played for the jury, a narrative of the recording was provided to the jury in the interest of time. The narrative stated that the Defendant requested to speak with Detective Brannon. The Defendant asked for help but was promised no help, and she acknowledged she understood. After the Defendant was read her *Miranda* rights, the detective read the Defendant's handwritten notes and reviewed the notes with her. After

reviewing the notes, the Defendant stated that Mr. Stokes had a gun and brought it to her house to hide it.

The Defendant described what she saw rather than what she heard the night of the shooting. She said she saw a "'fat man' with sandy hair" at the yellow house. She said she saw the "diamond sparkling." The Defendant said she, Mr. Stokes, Mr. Johnson, and Shadetree left Mr. Stokes's house and walked through the woods to the yellow house. She said she heard someone say "he is coming." She said that she entered the yellow house, that she used the bathroom, and that when she left the house, she saw the "fat guy" parked toward the woods. She said she sat down on the steps and saw from a distance Mr. Stokes, Mr. Johnson, and Shadetree talking to the fat man at the rear of the fat guy's car. She said the men talked for about ten minutes, although she could not hear what was said. She said that their voices became louder and that Mr. Stokes asked, "Why are you doing this?" She said the fat man, who had leaned into the trunk of his car, turned to Mr. Stokes and said, "What did you expect me to do?" She said that Mr. Stokes pulled out a gun and that she heard Mr. Stokes "cock it" as the fat man said, "[O]h god no." She said that the fat man fell and that she heard two or three more gunshots. She said that she was "freaking out" and that Shadetree said "something about having to do something with the girl." The Defendant was the only female present. She heard Mr. Stokes say that she would not talk to the police.

The Defendant admitted helping place the victim's body inside the trunk of the car and said the victim was "too big to fit otherwise." She described Mr. Stokes's retrieving two fuel cans from the porch and said she carried one of them. She said that Mr. Johnson and Shadetree drove to Mr. Stokes's house in the victim's car after the victim was placed inside the trunk. She said they smoked methamphetamine and placed the fuel cans in the trunk with the victim's body. She said she and Mr. Stokes left in the van, and Shadetree and Mr. Johnson left in the victim's car. She said Mr. Stokes took her home and Shadetree and Mr. Johnson took the car to where it was found by the police.

The Defendant described Mr. Stokes's handgun as blue or gray with a wooden grip and having a cylinder. The Defendant recalled that Mr. Stokes had the gun for a while and that she had seen it previously. She recalled that Mr. Steel had a .380 caliber pistol. She said Mr. Stokes's gun was "like the cowboy gun."

The Defendant denied meeting the victim and determined who the victim was when his photograph was in the newspaper after the shooting. She said the victim's car was the same type of car as Mr. Steel's car, except Mr. Steel's car was brown and the victim's car was black. She said Mr. Steel drove a Grand Marquis. The Defendant said that "they" manufactured methamphetamine at the yellow house, that she and Mr. Stokes had sex inside the house previously, and that Mr. Stokes cared for the yellow house, which "Bo" owned.

Detective Brannon testified that the Defendant's handwritten notes were different from the November 3 recorded statement. He agreed that although the Defendant said Mr. Steel was involved in the killing, she did not mention Mr. Steel in the recorded interview. He agreed Mr. Steel and Mr. Stokes were in police custody on November 3 because of information the Defendant provided. He said the Defendant told the police that Mr. Steel had a gun in their house, and during the search, methamphetamine products were found inside the home. He agreed Mr. Steel would have known the reason for his incarceration and said that if Mr. Steel communicated with the Defendant when they were both in police custody, the communications would have been mean. He said that he knew the Defendant and Mr. Steel communicated when they were in jail and that there was an incident involving the Defendant and another inmate removing a brick from the wall, although he did not know if Mr. Steel was involved.

Detective Brannon testified that he was not surprised that the Defendant did not mention Mr. Steel during the November 3 interview and that the Defendant mentioned different people each time she was interviewed. He said it did not occur to him that Mr. Steel threatened the Defendant and that the Defendant did not mention Mr. Steel because she feared him. He agreed that he asked the Defendant why her handwritten notes were incomplete and that the Defendant said she was scared. He said that sometime after Agent Melton interviewed the Defendant on November 3, he and Special Agent Brakebill took the Defendant to the yellow house and that the Defendant re-enacted what occurred.

Detective Brannon testified that the Defendant was interviewed on November 4, 2010, and the video-recorded interview was played for the jury. The recording was a "re-enactment" of the shooting at the yellow house and was narrated by Special Agent Brakebill as told by the Defendant. The Defendant said she left the house and sat at the end of the porch. She saw from a distance four people, including the victim, standing at the rear of a car with the trunk open. She said Mr. Johnson, Mr. Stokes, and Shadetree stood with the victim. She said that the men were talking, became loud, and that the victim turned around to get something from his trunk. She heard the victim say, "Oh God, no," followed by three gunshots. She said the victim began to fall, and she turned her head, covered her eyes, and screamed.

The Defendant denied walking to the victim's car. She said that the men put the victim inside the trunk of the car and that they had "a hard time." She said she walked home through the woods from Mr. Stokes's house, which was about 100 or 200 yards. She said that Mr. Stokes and Shadetree each grabbed a gasoline container and that Mr. Stokes grabbed her by her shirt and pulled her toward the victim's car. She said she and Mr. Stokes walked through the woods. She said that after she and Mr. Stokes arrived at his house, Shadetree drove the victim's car with Mr. Johnson inside to Mr. Stokes's house. She said they entered

Mr. Stokes's house and "got high." She said they left the house, and Shadetree drove the victim's car with Mr. Johnson inside. She said she and Mr. Stokes followed Shadetree and Mr. Johnson in a "maroonish-purple" van and drove to the location where the victim's car was found. She said, though, Mr. Stokes drove her home first. She said Mr. Stokes told her not to "be another loose end he had to tie up" and apologized for getting her involved in the killing. She said Mr. Steel was out looking for his gray rooster when the killing occurred. She admitted using the house to manufacture methamphetamine. She said that Mr. Stokes returned to her house over an hour later. She was afraid Mr. Steel would be upset with her.

The Defendant admitted telling various versions of how the killing occurred and agreed she attempted to point the police "in the right direction." When asked if she wanted to say anything to the victim's family, she said, "I didn't know. I didn't know." She agreed she had been read her *Miranda* rights "millions of times" and had waived those rights. She admitted asking to speak to the police and agreed the police had not harassed her. She said she knew how it felt because "Shawn was dead, too."

In a second segment in the recording, the Defendant and two police officers drove to Mr. Stokes's house. She said that she and Mr. Stokes walked to the house after the shooting and that Shadetree and Mr. Johnson drove to the house in the victim's car. She said that "they" put the gasoline cans on the end of the porch, entered the home, and "smoked dope." She said that they left the house, that they put the gasoline cans in the trunk of the victim's car, and that she saw a human hand inside the trunk. She assumed it was the victim's hand. She said that Shadetree and Mr. Johnson left in the victim's car and that she and Mr. Stokes followed them in the maroon van. The Defendant and the two officers followed the route she and Mr. Stokes and Shadetree and Mr. Johnson took that night. She denied that she and Mr. Stokes talked during the drive. She said Mr. Stokes took her home, and Shadetree and Mr. Johnson turned on another gravel driveway.

Detective Brannon testified that the victim was about 6'1" and stout and that the Defendant referred to him as the fat man. He agreed that the Defendant admitted being at the scene, that she was scared, that she was sorry for the victim, and that she implicated Mr. Corn in the killing.

Detective Brannon testified that on November 4, 2010, the Defendant also was interviewed by Agent Melton. Although the statement was not recorded, a written statement was signed by the Defendant and received as an exhibit. In the written statement, the Defendant stated that she was advised of her rights and agreed to answer questions regarding the victim's death. She stated that Mr. Stokes came by her house with Mr. Corn, whom she had been dating. Mr. Stokes told her that he needed her help, and she said she agreed to help. She said that she left with Mr. Stokes and Mr. Corn in a maroon-colored Ford Taurus, that

they went to Mr. Stokes's house, and that after they arrived, Mr. Stokes said he needed the Defendant to "play the role for him." She said Mr. Stokes told her that he was going to use her to lure a man to the yellow house and that she was going to pose as one of Ms. Vires's prostitutes. Mr. Stokes told her that "while posing as a prostitute he was going to place [her] in the yellow house" and that she only had "to look the role." She denied knowing what was going to happen to the man being lured to the yellow house but assumed Mr. Stokes and Mr. Corn were going to rob him.

The Defendant stated that after they arrived at Mr. Stokes's house, they "hung out" and consumed methamphetamine while waiting for the man to arrive. She said Mr. Stokes called someone mid-day and told the person he had a new girl who was "fresh meat." The Defendant said she was the new girl. She said Mr. Stokes used someone else's cell phone, although she did not know whose. She said they left Mr. Stokes's house and walked to the yellow house and that Mr. Stokes told her to go into the house. She said Mr. Stokes told her to turn on the television in order for the man to see light inside the house and to think someone was waiting for him. She said she knew Mr. Stokes possessed a gun because he always carried a gun, although she did not see the gun that day.

The Defendant stated that she saw a car arrive, that she left the house and walked to the porch, and that she and the man walked toward each other. She said that as the man walked toward her, Mr. Stokes and Mr. Corn came from the woods. She said the man said she was a "pretty young thing" and touched her face. She said she saw a large diamond ring on his finger. She said Mr. Stokes pulled out a gun and cocked it, and the man turned and said, "God, no!" She said Mr. Stokes immediately shot the man three or four times. She said she "stepped out of the way as the shots were fired."

The Defendant stated that after the victim was dead, Mr. Stokes and Mr. Corn began to carry his body to the victim's car and that Mr. Corn yelled for her to help load the victim's body into the victim's car. She admitted helping them load the victim's body into the car and folding his "legs back to get them into the trunk." She said that after the victim's body was placed in the trunk, the men agreed to meet at "the place." She did not know what that meant but said she knew "from the conversation . . . that Shawn and Boonie had already worked out the details." She said that she and Mr. Corn walked through the woods to Mr. Stokes's house to meet the car Mr. Stokes was driving. She said Mr. Stokes was going to drive the victim's car. She said she and Mr. Corn entered Mr. Corn's car and drove to meet Mr. Stokes. She said that before Mr. Stokes arrived on foot, she saw smoke from a distance and assumed that it was the victim's car and that Mr. Stokes used the fuel cans from the porch to set the fire.

The Defendant stated that she and the men drove Mr. Stokes home and that Mr. Corn drove her home. She said that Mr. Steel was not home when Mr. Stokes picked her up and

was not home when Mr. Corn dropped her off. She said that later that day, Mr. Stokes, Mr. Lance, Mr. Nipper, and Ms. Sullivan came to her house. She said she overhead Mr. Stokes tell Mr. Lance and Mr. Nipper, "[Y]ou should have seen the look in his eyes when I pulled the trigger." She said the men were outside near a metal outbuilding. She said that Mr. Stokes had a .38 caliber revolver, which she saw previously and assumed it was used to kill the victim, and that he jumped over the back gate and went into a field. She thought Mr. Stokes was disposing of the gun. She said that sometime afterward, Mr. Johnson told her that he buried the gun near a barn.

The Defendant stated that if she helped lure the victim, she would receive three boxes of pseudoephedrine for methamphetamine manufacturing but that she did not receive it. She denied seeing Mr. Stokes or Mr. Corn take money from the victim but thought Mr. Stokes took money because Mr. Stokes had money after the killing. She said that Mr. Stokes only had money from selling the methamphetamine she made and that Mr. Stokes should not have had as much money as he had at the time. She said Mr. Stokes purchased an expensive "set of heads" for his car.

The Defendant stated that she thought Mr. Stokes involved Mr. Corn because the Defendant was in love with Mr. Corn and would participate if Mr. Corn participated. She said that she and Mr. Corn discussed going to the police but that Mr. Corn was found "hanging from a tree." She believed Mr. Stokes was involved in Mr. Corn's death.

The Defendant denied seeing the victim before the shooting and said she learned the victim's identity later. She said it was her fault the victim and Mr. Corn were dead. She apologized for telling partially false statements previously, which implicated people who were not involved. She said she lied to protect Mr. Corn's reputation.

Detective Brannon testified that he learned witnesses heard gunshots at 3:00 or 3:30 p.m. and that the victim's car was found burning around 8:00 p.m. He agreed he investigated possible motives for the killing and said one possible motive was an angry husband or boyfriend. He agreed that Mr. Hope was employed at the Monroe County Sheriff's Office and that Mr. Hope stated he had killed the victim. He said that the victim and his wife had been separated for some time when the victim was killed and that the police investigated with whom the victim might have been involved romantically. He said that although the victim's wife received a threatening telephone call before the killing, the police could not identify the caller. He agreed he investigated whether someone was hired to kill the victim, although he denied the facts suggested a "hit man" was involved. He agreed the police also investigated robbery as a possible motive, which was the accepted theory. He agreed the Defendant did not admit being present during the killing, shooting the victim, mentioning being the bait, or

-39-

a robbery until she had been placed in the visitation booth for several days after returning to police custody on October 29, 2010.

Detective Brannon testified that he obtained the victim's cell phone records from July 17, 2010, and that the records did not show that a call to Mr. Stokes was received or placed. He agreed this contradicted the Defendant's statement that Mr. Stokes called the victim and used the Defendant as bait. He agreed a suspect could confess falsely if he or she felt scared and helpless or were threatened. He agreed he did not interview Sheriff Bivens or Mr. Morgan, who worked overseas at the time of the trial. He said that during the November 29, 2010 interview, the Defendant claimed that Mr. Steel and Mr. Stokes killed the victim, that Mr. Steel forced her to be a witness to the murder, and that she thought Mr. Steel was going to kill her. He agreed the Defendant was no longer confined to the visitation booth at the time she made this statement.

On redirect examination, Detective Brannon testified that when the Defendant was in police custody, the Defendant was treated the same as all inmates, was fed at the same time, provided water, and permitted to use the restroom. He thought that it was significant the Defendant mentioned seeing the victim wearing the two rings because the police had not mentioned the rings to her.

Detective Brannon testified that by early November the Defendant stated that Mr. Steel and Mr. Corn were not involved in the killing but that the Defendant implicated them again when Agent Legg interviewed the Defendant in late November. He agreed that the Defendant's cell phone contained photographs of Mr. Steel, although she claimed she feared him. He read a July 29, 2010 text message from Mr. Stokes found on the telephone the Defendant provided to the police. It stated, "Boonie, not a threat, Angel, I'm just saying, if Trav is the way you say, then you might want to consider leaving for a while. I would never hurt you. I just want you to be careful, that's all." He read a second message from Mr. Stokes on the same day, which stated, "Are you sure you know the truth? Are you sure you know what you think you know? Whose phone is that really?"

On recross-examination, Detective Brannon testified that Ms. Sullivan identified Mr. Hope as the person who shot the victim and "Gene" as the person who "cleaned up" by burning the victim's body. He agreed the photograph of Mr. Steel on the Defendant's cell phone was contained in a received text message. He said that Mr. Morgan processed the cell phone after the Defendant provided it to Special Agent Brakebill.

Rebecca Keller testified that she called the police after she learned the victim was killed and that she told Detective Brannon she heard three gunshots on July 17, 2010, between 3:00 and 5:00 p.m. She said there was about a one-minute pause between the first

and second shots and that the second and third shots were back-to-back. She said that about thirty minutes later, she saw a black Crown Victoria and a silver and burgundy van drive by her house when she and her family were getting ready to leave. She knew a third car drove by but only saw the dust from the gravel road. She said the Crown Victoria looked like an unmarked police car. She said that Mr. Stokes lived about 500 yards from her house.

Duane Bowling testified that the victim was his cousin and that they spoke often. He said that they had breakfast on July 17, 2010, and that he last spoke to the victim around 1:00 p.m. when the victim called to discuss purchasing cattle. The victim did not tell him what he was doing or where he was, but the victim stated that he "ran into something" and needed to take care of it.

Monroe County Administrator of Elections James Brown testified that he knew the victim for twenty years and that he saw the victim at the Election Commission office at 1:00 p.m. on July 17, 2010. He said that the county was holding early voting that day. He said that the victim carried cash in his money clip and that he saw the victim pay for pizza with cash from the money clip around lunchtime.

Paul Cain, Jr., testified that he had known the Defendant for over one year, that he had known Mr. Steel all of Mr. Steel's life, and that he rented his house from the victim for about seven years. He said that in July 2010, he built a barn on Mr. Steel's property and that Mr. Steel still owed him $40. He said that after he learned of the victim's death, he went to "the 7 til 11" where he saw the Defendant and Mr. Steel. He said Mr. Steel asked if he heard about the victim's death and stated, "I didn't have anything to do with it, because I don't even know the man." He said Mr. Steel offered to pay the $40 if Mr. Cain came by his house. He followed Mr. Steel home, and Mr. Steel paid him.

Mr. Cain testified that when he was at the Defendant and Mr. Steel's house, the Defendant asked him to install some new windows. The Defendant told Mr. Cain that she had the money to pay him for his work and showed him "a decent wad of money."

On cross-examination, Mr. Cain testified that the police interviewed him when he was in police custody for having a methamphetamine laboratory on his property. He denied being a convicted felon and said the drug-related charges were dismissed. He denied knowing how much money the Defendant had but said it was not thousands of dollars. He said the money was rolled up, not in a money clip. He was first interviewed by the police in July 2010.

Sweetwater Police Detective John Scruggs testified for the Defendant that he participated in the early stage of the investigation. He identified his notes from July 25, 2010, and said he received a telephone call from Sweetwater Police Sergeant John Brewster,

who told him Ms. Sullivan had been arrested for violating her probation and claimed to have information regarding the killing. He interviewed Ms. Sullivan, who did not mention the Defendant. He agreed that Ms. Sullivan said her source was Mr. Ellington, that she told him the murder occurred at a yellow house, and that he had Ms. Sullivan show him the location. He said his interview and trip to the yellow house were recorded. He agreed Ms. Sullivan was scared but did not recall the person she feared. Ms. Sullivan provided him with Mr. Ellington's address and telephone number, but he said he did not interview Mr. Ellington.

Detective Scruggs testified that Ms. Sullivan mentioned in her July 25 statement that a firearm was missing from the Monroe County Sheriff's Department. He submitted his notes to Special Agent Brakebill or Detective Brannon and thought someone would investigate Ms. Sullivan's statement. On cross-examination, he stated that he and Ms. Sullivan walked around the property surrounding the yellow house and that he looked for evidence related to the killing but found none.

Monroe County Sheriff's Chief Jailer Pat Wilson testified that the Defendant was booked at the jail on July 25, 2010, that she was released on July 26, and that she was booked again on October 29. He said he did not have the Defendant's "cell movement" records before November 3. He said the records showed that the Defendant was housed in a female cell until November 3, at which time she was moved to a visitation booth for administrative reasons. He said that if an inmate were not moved between cells, no transfer record would exist. He agreed cell 6 was near the men's cells and was separated by two walls and one hallway.

On cross-examination, Mr. Wilson testified that the Defendant was transferred to Meigs County on November 22, 2010, and that the Defendant returned on January 5, 2011. He identified the visitation booths and said that they were used three days per week as visitation cells for inmates to talk to their family and friends and that four days per week they were used as holding cells. He said that on visitation days, inmates housed in the visitation booths were moved to another cell. He said the visitation booth was 69½" by 37", which was enough space for an inmate of average height to lie on the floor to sleep. He said the Defendant was provided a mat for sleeping, three meals per day, water, access to a toilet, and access to a shower three times per week.

On redirect examination, Mr. Wilson testified that the Defendant's cell movement records were not detailed and did not show each time the Defendant was moved from a visitation booth to the hallway or another cell. He agreed that if the correction officer moving the Defendant failed to make an entry, he would have no way to know when and where the Defendant was moved.

Brandon Steel testified that he was confined in the Monroe County Jail and that he and the Defendant communicated inside the jail. He denied threatening her and telling her to "keep her mouth shut." He said she walked the halls saying that she loved him. He denied threatening her father if she refused to "take this murder charge."

Mr. Steel testified that he was arrested on July 10, 2010, after the police found a gun and methamphetamine inside his home and that he was a convicted felon. He admitted the drugs were his but said the gun belonged to the Defendant. He agreed he learned that the Defendant provided the police information that led to his arrest but denied he was mad at her.

Mr. Steel testified that his relationship with the Defendant did not become "nasty" and denied that he shot at her, although he admitted shooting at the floor. He denied stabbing, beating, and holding the Defendant hostage. He said their relationship ended before the killing. He agreed the Defendant began dating Mr. Corn but denied threatening Mr. Corn. He denied placing the Defendant in the trunk of his car on July 17, 2010, and denied killing the victim.

On cross-examination, Mr. Steel testified that he had a motorcycle accident in July 2010 before the victim's death. He described the injuries to his leg and said he could barely walk in July 2010. He said that at the time of the killing, he was dating Rachel Graves, who was present when the police searched his house. He agreed he and the Defendant wrote letters to each other when they were in the local jail.

Monroe County Sheriff's Investigator Conway Mason testified consistently with his suppression hearing testimony regarding his participation in the investigation. On cross-examination, he stated that he knew Mr. Nipper from a traffic stop one week before the killing. He said that evidence was seized from Mr. Nipper's car during the stop, that Mr. Nipper was charged with weapon- and drug-related charges, that the evidence was placed in the evidence room, and that the trial court later dismissed the charges. He agreed the seized evidence remained in the police evidence room.

Walter Hunt testified that he worked part time for the Bradley County Sheriff's Office and that in July 2010, he worked as an investigator for the district attorney general. He said he participated in two of the Defendant's interviews, although he could not recall the dates. He recalled one of the interviews began around 10:00 or 11:00 p.m. after the Defendant was picked up from her parents' house. He identified his notes. He said the law enforcement agencies decided that the TBI would lead the investigation because of "previous history" between the "the family" and Sheriff Bivens and other members of the sheriff's office, including Mr. Morgan and Mr. Hope. On cross-examination, he stated that he participated

in Mr. Hope's police interview and that he verified Mr. Hope's whereabouts on the day of the killing.

Wallace "Boonie" Stokes, Jr., testified that he lived in the yellow house. He said he and Mr. Steel were former friends. He denied participating in the killing. He denied sending text messages to the Defendant and said he had never possessed a cell phone in his name. He said he had never sent anyone a text message. On cross-examination, he stated that he met the Defendant through Mr. Steel, that he and the Defendant had an affair before the victim's death, and that they met at the yellow house where the victim was killed.

Ellen Wilburn testified that in 2010, she was a corrections officer at the Monroe County Sheriff's Office and that she recalled the Defendant's arriving in late October 2010. She testified consistently with her suppression hearing testimony regarding the conditions of the Defendant's confinement. She said that during the time the Defendant was confined at the jail from October 29, 2010, until she was transferred to Meigs County, Mr. Steel and Mr. Stokes were incarcerated at the jail. She knew the Defendant and Mr. Steel communicated when there. She said it was difficult to move the Defendant without Mr. Steel "screaming and yelling and kicking on the door" of his cell. She said that although she could not recall everything Mr. Steel yelled, she recalled Mr. Steel's telling the Defendant to "keep her mouth s. . . to shut up," which he understood as a threat. She said that although she did not hear Mr. Steel make additional threats, other inmates reported Mr. Steel's threats.

Officer Wilburn testified that she was responsible for placing the Defendant in the holding cell after each interview. She recalled the Defendant was either quiet or upset after each interview. She testified consistently with her suppression hearing testimony regarding her concern for the Defendant's safety.

On cross-examination, Officer Wilburn testified that she worked the day shift from 6:00 a.m to 6:00 p.m. in November 2010. She agreed the Defendant might have been interviewed outside her shift. She said it was not uncommon for inmates to be housed in the visitation booths due to jail overcrowding. On redirect examination, she stated that the Defendant was housed in the visitation booth longer than any other inmate.

The defense played several excerpts from the Defendant's November 3, 2010 video-recorded interview. In the recording, she stated that she heard gunshots and that the man fell. She said she "freaked out." The recording shows that the Defendant became upset and cried. She said the gun used was buried behind "Sherry's" house near a barn. She said the man was big and Caucasian and had sandy blonde hair. She said "they" were hiding in the tree line of the woods when the victim arrived. She said the victim's car was dark colored. She said she saw the victim turn and lean into his trunk and heard the victim say, "Oh, God no,"

followed by gunshots. She denied the victim arrived with another person. She said the maroon van was parked at Mr. Stokes's house. She said the victim did not say anything to her. She said the victim and the men talked for about ten minutes. She drew a diagram of the area where the killing occurred. She said the victim was standing near his car when he was shot.

The Defendant said that she was inside the house when the victim arrived and that she left the house and sat on the porch. She said that the victim, Mr. Stokes, and Mr. Steel talked, that their voices became loud, and that she heard gunshots. She denied knowing what the men talked about and speculated it might have been about "dope." She said the trunk of the victim's car was open, and the victim turned and leaned into it. She said "they" shot the victim, who fell to the ground.

The Defendant stated that she walked to Mr. Stokes's house after the killing and that the victim's car was driven to Mr. Stokes's house. The Defendant was permitted to smoke a cigarette. She said that "they" took her home and that Mr. Steel was not home when she arrived. The Defendant spoke very low and became inaudible. Special Agent Brakebill showed her a semi-automatic gun, and she said the gun was different. She said the gun was round, and the officers showed her a photograph of a revolver. She said the gun was bluish gray.

The Defendant said she saw the victim's hand in the trunk of the car and then spoke low and became inaudible. She said they had difficulty putting the victim inside the trunk of the car because he was a big man. She described the position of the victim's body inside the trunk and said they had to fold the victim's body to get him inside. She said she and Mr. Stokes carried gas cans from the yellow house to Mr. Stokes's house.

Robert Hope testified that he worked at Heil Trailer International but had been a Monroe County Sheriff's captain in July 2010. He said that he knew the victim from his work with the sheriff's office and that he gave the victim a speeding ticket about three months before the killing. He denied the ticket created contention between them but said the victim "thought he was above the law," ran blue lights inside his car, and carried a badge. He said the victim had no reason to make his car look like an unmarked police car.

Mr. Hope testified that he recalled going to Jim Plemons's home with Doug and Brenda Stakely sometime after the victim was killed. He said they discussed the victim's death. He said he told them that the investigation was "all political" and that he did not understand why he was questioned about the killing. He denied telling Mr. Plemons and Ms. Stakely that he killed the victim.

-45-

On cross-examination, Mr. Hope testified that during his interview, he told the police where he was at the time of the killing. He said he gave the police receipts from the stores he visited, which was confirmed by store video cameras. He said he went to his brother-in-law's house later that night, although no one interviewed his brother-in-law.

Brenda Stakely testified that she knew Mr. Hope and Mr. Plemons but that she did not know the victim. She said that sometime after the victim was killed, she, her husband, and Mr. Hope went to Mr. Plemons's house. She said Mr. Hope started drinking and became intoxicated. She said Mr. Hope told her, Mr. Plemons, and Mr. Plemons's wife four or five times that he hated the victim and Doug Watson and that he killed the victim, put his body in the trunk, and burned the victim "like the pig he was."

On cross-examination, Ms. Stakely testified that her husband "passed out drunk" three or four hours before Mr. Hope admitted killing the victim and that Mr. Hope continued drinking during that time. She agreed that Mr. Hope made these statements about one month after the killing and that the facts surrounding the killing were public knowledge by that time. She denied drinking.

Jim Plemons testified that he knew Mr. Hope and Ms. Stakely and that sometime after the killing, Mr. Hope and Ms. Stakely came to his house. He said that Mr. Hope was drinking and became intoxicated. He said that they were talking about the murder and that Mr. Hope "blurted out" twice that he killed "the pig . . . and stuck him in the trunk of his car and burned him." Mr. Plemons denied drinking that night. On cross-examination, he stated that the Stakelys and Mr. Hope arrived between 8:00 and 9:00 p.m. and that Mr. Hope made the statement about an hour later.

Dr. Kathryn Smith testified that she performed a psychological evaluation on the Defendant and that she met with the Defendant on October 21, 2011, November 18, 2011, and May 17, 2012. She learned that the Defendant suffered childhood abuse and received previous psychological treatment for post-traumatic stress disorder, depression, bipolar disorder, and schizophrenia. She confirmed the information provided by the Defendant through various records and noted the Defendant under reported the amount of "adversity she experienced throughout her life." She said the Child Protective Services (CPS) records were about 5" thick and showed a history of sexual and physical abuse, a history of neglect, and the Defendant's stepfather's brother was convicted of aggravated sexual battery against the then-five-year-old Defendant. She said the Defendant's stepfather was convicted of assaulting the then-seven-year-old Defendant. She said that when the Defendant was fourteen years old, her uncle was convicted of sexually assaulting her and her siblings and that the uncle was serving 101 years in an Indiana prison.

-46-

Dr. Smith testified that the Defendant moved frequently as a child, that the moves "seemed to be . . . an attempt to evade" CPS, and that many of the homes were uninhabitable. She said the Defendant was removed from the home frequently and later returned. She said that the Defendant's first psychiatric hospitalization was at age eight for "disturbed psychology." She said that at age seven, the Defendant's stepfather beat her with a stick for urinating on the floor, that he chased her with a knife and cut her hand, and that he attempted to make her smoke marijuana. She said that from age seven, alcohol and drugs were available to her inside the home.

Dr. Smith testified that she performed several tests on the Defendant, that her full-scale IQ was ninety, and that a full-scale score of ninety to 110 was "normal." She performed two structured clinical interviews. She administered the Hare Psychopathy Checklist Screening test to determine if the Defendant had antisocial characteristics, the Wechsler Memory Scale test to determine if she had difficulties with memory, and a test of memory malingering. Regarding post-traumatic stress, she provided the Defendant with a life events checklist, which gave the Defendant the opportunity to describe her traumatic experiences. She said another clinician administered the structured interview for post-traumatic stress.

Dr. Smith testified that she concluded that the Defendant had post-traumatic stress disorder, severe major depression with psychotic features, and dysthymic disorder, which was a "low grade" form of episodic and chronic depression. She said that the trauma the Defendant experienced as a result of the sexual assaults and physical abuse led to the post-traumatic stress disorder diagnosis and that the Defendant lived in a chronic state of anxiety. She said that the hospitalization records from when the Defendant was institutionalized at age eight confirmed the trauma and showed that the Defendant had severe major depression, post-traumatic stress disorder, and emergent borderline personality traits. The records also showed that the Defendant had nightmares, had disassociated, was depressed, was suicidal, and had thoughts of harming others. She concluded that the Defendant self-medicated to "alter [her] mood and . . . mind" because the drug use began after the psychological disorders were present. She noted the Defendant stated that methamphetamine made her emotionless. She said that the Defendant's violent and abusive relationship with Mr. Steel caused her additional trauma associated with post-traumatic stress and noted that he beat, shot at, and tried to cut her.

Dr. Smith testified that regarding the Defendant's major depressive disorder with psychotic features, the Defendant had a "better off dead" attitude and displayed symptoms of major depression. The Defendant reported hearing voices since she was age eight. She denied the Defendant had schizophrenia and said the Defendant's mind was affected by depression and had altered sensory experiences. She said the hallucinations ended if the

depression ended. She said regarding dysthymic disorder that the Defendant had periods of irritability, pessimism, a gloomy outlook, and self-loathing. She concluded the dysthymic disorder presented first and that the first major depression occurred when the Defendant was age eight. She said the Defendant was previously diagnosed with major depression at ages fourteen and twenty-three and received treatment.

Dr. Smith concluded that the Defendant had methamphetamine and marijuana dependence. The Defendant used methamphetamine and marijuana several times daily from age twenty-one, when her first marriage ended, to the time of her incarceration. She concluded that the Defendant had borderline personality disorder and depressive personality disorder. Regarding borderline personality disorder, she said it developed because of a poor childhood environment with instability, unreliability, chaos, and abuse. She said, though, that borderline personality disorder was not diagnosable in children but that it manifested in adults who had unstable relationships and strong fears of abandonment. She said that the Defendant's "flip flop" in her relationship with Mr. Steel was indicative of borderline personality disorder because patients with the disorder fluctuated between idolizing and loathing loved ones. She said chronic emptiness associated with borderline personality disorder made a patient vulnerable to drug use, self-mutilation, and suicide. Regarding depressive personality disorder, she said that although the Defendant displayed characteristics of the disorder, it was an "experimental disorder" that needed further research and was not fully endorsed. She said it was similar to dysthymic disorder.

When asked if the Defendant's psychological disorders affected her ability to exercise "reasonable judgment" during interviews by persons in a position of authority, Dr. Smith testified that the Defendant's disorders made her thought processes "much less efficient." She said it was difficult to think when chronically anxious, depressed, and detoxifying from methamphetamine, all of which occurred when the Defendant was taken into custody. She reviewed the Defendant's recorded police interviews from early November. She agreed that the Defendant said she was threatened when in the Monroe County Jail and said that the Defendant processed the threats differently from someone who had never been a victim of the types of trauma the Defendant suffered. She said the Defendant did not perceive the threats as idle and noted that the Defendant knew "bad people do bad things to people who don't have power." She said that the Defendant's ability to think was limited and that she was without "higher order cognitive functioning involving planning and consideration of consequences."

Dr. Smith testified that given her diagnoses, the Defendant's being confined in the visitation booth and in isolation would have had "an even greater detrimental effect." She concluded the psychological disorders compromised the Defendant's ability to plan, judge, and consider consequences before being confined in the visitation booth. She said long-term

confinement in the visitation booth would have caused the Defendant's level of distress to increase, and over time, fatigue would have further affected her ability to think, plan, and reason. She said that the Defendant's history had not shown her help was available and that the Defendant would not have thought to ask for help. She concluded that because of the Defendant's history of abuse, the Defendant was more vulnerable to do or say what someone wanted her to do or say. She said the Defendant had survived and determined how to adapt in situations where someone had power over her, meaning she learned to determine what people wanted to hear and to satisfy someone with power over her.

On cross-examination, Dr. Smith testified that her three sessions with the Defendant spanned more than four hours, five hours, and three hours respectively. She agreed her diagnosis regarding drug use was based on the Defendant's self-reported information and life-long medical records. She agreed that her evaluation occurred after the Defendant had been in police custody for one year and that the Defendant's statements to the police occurred one year before her evaluation. She denied interviewing or attempting to interview Mr. Steel and said her conclusion that the Defendant and Mr. Steel's relationship was violent and abusive was based on the Defendant's self-reported information and an interview of the Defendant's former father-in-law, Joe Strugill, who confirmed that Mr. Steel beat her.

Dr. Smith testified that she had not studied the "reactions of incarcerated persons" regarding confinement. She said the cumulative effect of excessive police interviews had a "piling on" effect. She said stressful experiences were more stressful when they occurred over an extended period of time. She agreed that during the police interviews, the Defendant asked the officers what they could do for her and when she could get out of jail.

On redirect examination, Dr. Smith testified that the time she spent with the Defendant equaled the number of hours of recorded police interviews and that "the equation" would change if additional police interviews occurred that were not recorded. She said the Defendant under reported information due to repression of painful, repetitive trauma. She said this was unusual because in most forensic evaluations, people told her every bad thing that ever occurred because the result of the evaluation was supposed to help them get out of trouble. She said the Defendant's taking a soft drink and asking for tobacco products was a type of reward for her talking to the police.

TBI Agent Jason Legg testified that he interviewed the Defendant on November 29, 2010, when she was in the Meigs County Jail. The recording of the interview was received as an exhibit and played for the jury. In the recording, he told the Defendant that he did not think she killed the victim, and she said, "Crazy people do crazy things." When asked why she wanted to "take the wrap" for something she did not do, she responded that she had three kids and had already lost one person in her life. She said she was at home at the time of the

killing, heard sirens, and thought the police were coming to arrest them for making drugs. She said she wanted her kids to live.

The Defendant said she told Special Agent Brakebill that the victim was shot three times with a gun provided by Mr. Steel but that she did not know the gun's location. She said she told the police this version because "they" would hurt her children if she did not. She did not want to be the person who placed "them" at the scene. She said Mr. Steel mentioned owing the victim money, denied meeting the victim, and said "she never laid eyes" on the victim until his photograph was in the newspaper after the killing. She denied killing the victim and said she was not a cold-blooded killer.

When asked why she confessed, she said "they" were going to hurt her children, although she refused to identify who "they" were. When asked to prove her children were at risk, she said, "Well, Shawn is dead." Agent Legg told her Mr. Corn killed himself, but she did not believe he committed suicide. When asked why her children were in danger, she said, "Because I know Brandon." She said Mr. Steel played "a big part" in the victim's death. She said she was willing to spend the rest of her life in prison for something she did not do to protect her children. She said Mr. Steel previously stabbed her and shot at her. She denied knowing how the victim was killed. She said she would "like to get it off her chest," but she did not want to remain in jail. She said she was not going to help the police when they would not help her with the simple possession charge. She said she was tired of helping the police and wanted to be with her children.

The Defendant said the police had two people in jail who were involved with the killing but that the police refused to do something about it. She identified Mr. Steel and Mr. Stokes as the two men. She said that the police were going to let Mr. Steel and Mr. Stokes "walk" and that her children "were out there." She said Mr. Stokes was cold. She said she was waiting for the police to put the pieces together because she did not want to "put it out there." She denied that she was "holding back" information to benefit herself. She agreed she lied in her previous interviews but said Mr. Steel and Mr. Stokes were hired "to do a job." She said they were paid by two people. She said that the police might "get" Mr. Steel and Mr. Stokes but asked about the people who hired them. She said she was scared and told the police to figure it out. Agent Legg said that if Mr. Steel and Mr. Stokes killed the victim, they acted alone and committed a robbery.

The Defendant said Mr. Steel and Mr. Stokes picked her up from her house on the night of the killing, that they were driving the "purple-ish" van, that they went to the yellow house behind Mr. Stokes's house, that Mr. Steel and Mr. Stokes each had a gun, and that one of them shot the victim in the head. She said that she came out the sliding glass door, that she heard the victim say, "It didn't have to go this way," and that she heard three gunshots.

She said Mr. Steel and Mr. Stokes loaded the victim's body into the victim's car. She said Mr. Steel drove the victim's car to where it was found, and Mr. Stokes drove the van and picked up Mr. Steel. She said that they left her in the woods, that she called Mr. Corn to pick her up, and that Mr. Corn picked her up. She said Mr. Corn's body was found on the victim's property.

The Defendant stated that the police put her in the drunk tank with Mr. Steel on one side of her cell and Mr. Stokes on the other side and that they sent her threatening messages through the walls. She did not know why they brought her the night of the killing and said it was not the first time Mr. Steel had a gun and told her to leave with him. She said she "freaked out" when the victim was killed. She did not know if Mr. Steel and Mr. Stokes took anything from the victim's car because they left her at Bo Coe's house, where the killing occurred. She said Mr. Steel threatened to kill Mr. Corn previously.

The Defendant stated that at one point, Mr. Steel said Mr. Morgan was involved in the victim's killing, although she did not ask any questions. She said Mr. Morgan, whom she disliked, picked her up from her parents' house once and stressed during the drive that the Defendant was in a lot of danger.

The Defendant told Agent Legg that it was not unusual for both Mr. Stokes and Mr. Steel to have guns. She said one had a .38 and the other had a .380. She said she found out later from the TBI that the victim was shot with a .38 caliber. She said she saw the victim's knees buckle and turned her head. She said the victim was standing by the victim's car door. She said Mr. Stokes and Mr. Steel each had guns pointed at the victim but did not know which one fired the gun. She drew a diagram of where the victim stood at the car and where she stood on the porch. She said that gas cans were on the porch and that Mr. Steel put them in the trunk of the victim's car. She said the cans had been there before that day because they were used to "cook dope." She said she showed the police where Mr. Steel buried the twelve-gauge shotgun he used to shoot his mother and told the police the two possible locations of the .38 caliber pistol. She denied receiving money as a result of the victim's death and said they left her in the woods.

The Defendant stated that she next saw Mr. Steel two weeks later and that she did not recall when she next saw Mr. Stokes. Agent Legg told the Defendant that the victim's weakness was women, and the Defendant said she had figured that out since she had been under investigation. She said she was accused of luring the victim to the yellow house to have sex with him for money and denied being a prostitute. She denied knowing why Mr. Steel made her go that night. She said Special Agent Brakebill knew Mr. Steel and Mr. Stokes were involved but could not prove it.

When asked what Mr. Steel said to her when he picked her up, the Defendant said he told her that she was coming with him. She said that she replied, "Bulls---," and that he pulled out a gun. She did not know what kind of gun it was or if it was a revolver or semi-automatic gun because her focus was whether he was going to hurt her. She said she knew the difference between a semi-automatic handgun and a revolver.

The Defendant denied talking to the victim on the telephone on the day of the shooting or at any time. She did not know who the victim was when he left his car that day. She said she knew "Kenny" was the victim's brother but did not know him well. She said that when she was in jail, she talked to a woman named Miranda, who said the victim's brother Kenny "contracted the hit" on the victim. She said, though, she did not know if Miranda's statement was true.

Agent Legg testified that he told the Defendant the interview was being recorded and denied that he read the Defendant her *Miranda* rights. He agreed the Defendant provided her and Mr. Corn's cell phone numbers but did not know if the information was investigated.

Upon this evidence, the jury convicted the Defendant of facilitation of felony murder, facilitation of aggravated robbery, facilitation of burning personal property, and facilitation of abuse of a corpse. This appeal followed.

## I & II

The Defendant contends that the evidence is insufficient to support her convictions in that it failed to show that she substantially assisted in the commission of the robbery. In a related issue, the Defendant contends that the trial court erred by denying her motion for a judgment of acquittal or a new trial pursuant to Tennessee Rule of Criminal Procedure 29. Regarding each issue, she argues that her November 10, 2010 statement was the only statement offered as substantive evidence and was the only statement that should have been considered for purposes of sufficiency of the evidence and her motion for a judgment of acquittal. The State agrees that the only question regarding the sufficiency of the evidence is whether the Defendant knowingly furnished substantial assistance in the robbery and argues the evidence is sufficient in this regard. The State disagrees that the Defendant's November 10 statement was the only statement offered as substantive evidence. We conclude that the Defendant is not entitled to relief.

On appellate review of a denial of a motion for a judgment of acquittal, we apply the same standard as a question of the sufficiency of the evidence. *See, e.g.*, *State v. Brewer*, 945 S.W.2d 803, 805 n.2 (Tenn. Crim. App. 1997). Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)).

Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Regarding the Defendant's police statement, the record shows that the State offered her November 10, 2010 statement in its case-in-chief. The remaining statements were offered by the Defendant on cross-examination of the State's witnesses or in her case-in-chief. The statement most notably at issue is the Defendant's November 3 statement in which she detailed her acting as bait to lure the victim to the scene and her carrying gas cans after the killing. She argues that the statements she offered were "solely for the purpose of impeaching her November 10, 2010 statement" and were not substantive evidence.

The record shows that before the trial, the Defendant sought admission of all her statements to the police on the basis that they were relevant and admissible under Tennessee Rules of Evidence 106, 401 and 402. She further argued that her November 26, 2010 and January 13, 2011 statements qualified as a state of mind exception to the hearsay rule. The trial court granted the Defendant's motion to present all of the Defendant's statements pursuant to the rule of completeness in Tennessee Rule of Evidence 106 and to permit the jury to consider the "context and circumstances in which the [November 10, 2010] statement was given." The court also stated, "Many of the statements [were] not being admitted for the truth of the matter asserted, and therefore those statements [were] non hearsay." The court did not specify the statements to which it was referring.

At the hearing on the motion for a new trial, the Defendant argued that it was impermissible for the jury "to draw a factual conclusion based on the[] other statements."

Counsel agreed that he did not request a special jury instruction regarding the permitted use of the other statements. The court stated that it

> didn't understand, as we got through this trial, nor was it made by way of an objection or a special jury instruction, that the defense was arguing that the jury couldn't extrapolate a . . . version of events from . . . these multiple statements, as well as a corroborating evidence. And I don't think there's any ruling by the judge or any rule that precluded the jury from doing so.

The record fails to show that the Defendant requested a special instruction regarding the limited use and scope of the statements or told the court that the statements were not being introduced as substantive evidence. We conclude that the issue is waived. *See* Tenn. R. Evid. 103(a)(1); T.R.A.P. 36(a) (stating relief is not required if the party seeking it "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error"). Thus, our review is limited to one for plain error. *See* T.R.A.P. 36(b).

> Our supreme court has adopted the factors developed by this court to be considered
>
> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642.

Regarding the Defendant's claim that the relevant statements were offered for impeachment purposes only, our supreme court has concluded that "prior inconsistent statements . . . are admissible for the purposes of impeachment and testing the credibility of the witness." *Jones v. Lenoir City Car Works*, 392 S.W.2d 671, 673 (Tenn. 1965). Generally, prior inconsistent statements may not be "considered as substantive evidence of the truth of the matter asserted therein." *Id.*; *see Rhea v. State*, 347 S.W.2d 486, 488 (Tenn.

1961) (concluding that "any prior contradictory statements shown are not to be taken as evidence of the facts . . . stated but are simply limited to the function of discrediting the witness"). "Upon an objection, the trial court should exclude a prior inconsistent statement when offered as substantive evidence . . . , and upon request, the court should instruct the jury that the . . . statement may only be considered as reflecting upon the credibility of the witness." *Smith*, 24 S.W.3d at 279 (citing Tenn. R. Evid. 105) (stating that "[w]hen evidence which is admissible . . . for one purpose but not admissible . . . for another purpose is admitted, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"). A trial court, though, "generally has no duty to exclude evidence or to provide a limiting instruction to the jury in the absence of a timely objection." *Id.* Likewise, "[a] party may consent to the admissibility of evidence which is otherwise prohibited by the Rules[.]" *Id.* Absent an objection, "the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" *Id.* at 280 (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)). Likewise, when hearsay evidence "is admitted without objection, 'it is, therefore, rightly to be considered as evidence in the case and is to be given such weight as the jury think[s] proper.'" *Id.* (quoting *State v. Bennett*, 549 S.W.2d 949, 950 (Tenn. 1977)); *see Casone v. State*, 246 S.W.2d 22, 28 (Tenn. 1952).

The Defendant's statements were admissible pursuant to the rule of completeness. Tennessee Rule of Evidence 106 states, "When a . . . recorded statement or part thereof is introduced by a party, an adverse party may require that introduction at that time of . . . any other . . . recorded statement which ought in fairness to be considered contemporaneously with it." Evidence admitted pursuant to this rule must be relevant and explain or qualify proof already admitted. *State v. Vaughan*, 144 S.W.3d 391 (Tenn. Crim. App. 2003). The rule is "designed to ensure 'that the trier of fact be permitted to assess related information without being misled by hearing only certain portions of the evidence.'" *State v. Hartman*, 42 S.W.3d 44, 61 (Tenn. 2001) (quoting *State v. Keough*, 18 S.W.3d 175, 182 (Tenn. 2000)). Once multiple statements are admitted under Rule 106, "the jury is to determine which statements to accredit."

Although the Defendant claims that her statements were used to impeach the credibility of her November 10 statement, she failed to make her intended use of the statements known to the court and failed to request a limiting instruction prohibiting the jury from using the statements as substantive evidence. The Defendant's statements were admitted pursuant to the rule of completeness in Tennessee Rule of Evidence 106 and to permit the jury to consider the "context and circumstances in which the [November 10, 2010] statement was given." We conclude that plain error does not exist. As a result, the trial court did not err by considering the November 3, 2010 statement in denying the Defendant's

motion for a judgment of acquittal or new trial. We also conclude that the jury was permitted to consider all the Defendant's statements in reaching its verdicts.

Relevant to the sufficiency of the evidence, first degree murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" T.C.A. § 39-13-202(a)(2) (2010). The only intent required is the intent for the predicate offense, and it must exist before or concurrent with the commission of the act resulting in the victim's death. *Id*. § 39-13-202(b) (2010); *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). Aggravated robbery, in relevant part, is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" T.C.A. § 39-13-402(a)(1) (2010). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401(a) (2010).

It is a crime to "knowingly damag[e] any personal property, land, or other property . . . by means of a fire or explosion . . . [w]ithout the consent of all persons who have a possessory or proprietary interest therein[.]" *Id*. § 39-14-303(a)(1) (2010). Abuse of a corpse occurs when a defendant knowingly and without legal privilege, "[p]hysically mistreats a corpse in a manner offensive to the sensibilities of an ordinary person[.]" *Id*. § 39-17-312(a)(1) (2010). A person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id*. § 39-11-402(2) (2010). However, a person is only responsible for the "facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id*. § 39-11-403(a).

Although the Defendant provided numerous versions of events regarding the killing and implicated numerous people, the evidence shows in the light most favorable to the State that the victim was shot three times in the head, his body placed inside his car, and his car set on fire. On November 10, 2010, the Defendant admitted Brandon Steel planned to rob the victim and mentioned the robbery earlier that day. She concedes in her brief that the victim was killed during the perpetration of a robbery.

The Defendant placed herself at the shooting when she stated in her November 10, 2010 statement that after the victim was shot, she had blood on her face and clothes and admitted that her clothes were burned. She said that before the victim was shot, the victim touched her face and said, "You're a pretty young thing." On November 4, 2010, the Defendant told TBI Agent Melton that she agreed to pose as one of Becky Vires's prostitutes to lure the victim to the yellow house. The Defendant was told she only had "to look the

role." She denied knowing what was going to happen but said she assumed a robbery was going to occur. She said she was told to turn on the television inside the yellow house in order for the victim to think someone was waiting for him. On November 10, she said the victim knew where to come because it was arranged previously. The Defendant admitted the victim touched her face and said the victim was shot when standing close to her outside the yellow house. The Defendant admitted playing her "own part" and said she had to serve time for her part. We conclude that a rational trier of fact could conclude beyond a reasonable doubt that the Defendant substantially assisted others by luring the victim to the yellow house under the pretense of having sex with her. We note that the Defendant admitted carrying one of the fuel cans to Mr. Stokes's house, which was later placed in the trunk of the victim's car and used to set the victim's car on fire. We conclude that the evidence supports the Defendant's convictions for facilitation of felony murder and facilitation of aggravated robbery.

Regarding facilitation of burning private property and facilitation of mutilation of a corpse, the Defendant admitted helping place the victim's body in the trunk of the victim's car. She recalled the victim was a large person and said he was "too big to fit" without her help. She admitted in her November 3 statement that after the shooting and after the victim's body was placed inside the victim's car, she carried one of the fuel cans to Mr. Stokes's house, which was later placed in the trunk of the victim's car and used to set the victim's car on fire. We conclude that a rational trier of fact could conclude beyond a reasonable doubt that the Defendant substantially assisted another by placing the victim's body inside the trunk of his car and by carrying a fuel can that was used to set the victim's body and his car on fire. The Defendant is not entitled to relief on this basis.

### III

The Defendant contends that the trial court erred by denying her motion to suppress her November 10, 2010 statement to the police. She argues her statement was involuntary and was the result of a coercive environment of confinement and "exacerbated by a reasonable fear for the safety of her family." The State responds that the Defendant's statement was voluntary and argues the trial court did not abuse its discretion. We agree with the State.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996); *State v. Jones*, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence

and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997). In reviewing the correctness of a trial court's ruling on a motion to suppress, this court is permitted to consider evidence presented at the trial and at the suppression hearing. *See State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998); *see also State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012).

"The test of voluntariness for confessions under Article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citing *State v. Stephenson*, 878 S.W.2d 530, 544 (Tenn. 1994)); *see State v. Northern*, 262 S.W.3d 741, 763 (Tenn. 2008). For a confession to be considered voluntary, it must not be the product of "'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" *State v. Smith*, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). The essential question is "'whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined. . . .'" *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). The Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action. *See, e.g., Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986).

After considering the evidence presented at the suppression hearing, the trial court found that before November 10, 2010, the Defendant was originally considered by the police as a source of information regarding the victim's murder because she claimed to have overheard people talking about the killing. The Defendant talked to police often, and often on her own initiative. The court stated that she told the police a number of conflicting stories and provided inconsistent information. The court stated, and counsel conceded in his argument, that the critical period of determining whether the November 10 statement was voluntary was between October 29, 2010, and November 10, 2010.

The trial court found that the Defendant was returned to the Monroe County Jail on October 29, 2010, and placed in a small holding cell without a toilet, water, or a bed, although she was provided a mattress to sleep on the floor. The court stated that although a "detective hold" was placed on the defendant, the hold related to charges in other counties. The court noted that the hallway adjacent to the holding cell had "constant traffic" and found that the Defendant was permitted to use the restroom when requested. The court found that the evidence failed to show the Defendant complained to anyone about the conditions of her

confinement, although she told the law enforcement officers that she received threats and feared for her safety.

The trial court found that testimony showed that the Defendant had difficulty sleeping in the holding cell and that the Defendant received threats from Brandon Steel, whom the Defendant implicated in the killing in some of the statements and who was also an inmate. The court stated that Mr. Steel threatened her and that she told TBI agents and sheriff's deputies she was afraid of Mr. Steel. The court noted that Mr. Steel and Mr. Stokes were in the county jail because the Defendant provided information about unrelated criminal conduct and that they knew they were arrested because of information she provided. The court found that although supervisors were told about the threats, the Defendant was not moved from the visitation booth. The court noted, though, the Defendant never requested to be moved.

The trial court found that on November 3, 2010, the Defendant asked to speak with officers about the killing and provided a conflicting statement on November 4. The court stated that on November 3, she "admitted participating in what she thought would be [a] robbery," admitted being bait to lure the victim to the scene, and admitted Mr. Stokes and Mr. Corn robbed the victim. The court found that the Defendant helped Mr. Stokes and Mr. Corn place the victim's body inside the trunk of the victim's car, although Mr. Stokes shot the victim.

Regarding the November 10, 2010 statement, the trial court found that the Defendant was read her *Miranda* rights, that she stated she understood her rights, that she said Mr. Steel planned a robbery, and that she admitted killing the victim. The court stated that the Defendant said she used a .38 caliber revolver provided by Mr. Steel to kill the victim. The court noted that the Defendant denied having sexual relations with the victim and meeting the victim before the day of the killing. The court found that she said she was close enough to the victim to see his diamond ring and that she denied receiving any of the victim's money or property. The court noted the Defendant said that she and Mr. Steel were about $130 short for their rent payment but that Mr. Steel had money later. The court found that the Defendant said she helped place the victim's body inside the trunk, was left alone at the scene, and called Mr. Corn to pick her up.

The trial court found that the Defendant was moved to the general jail population the same day she provided her November 10, 2010 statement and was transported to Meigs county to address unrelated charges later that day. The court stated that when in Meigs County, the Defendant was interviewed by TBI Agent Legg on November 29, 2010, and that she partially recanted her November 10 confession. The court noted that during the November 29 interview, the Defendant said that although she was present, Mr. Steel shot the victim and that she confessed to protect her three children from Mr. Steel and Mr. Stokes.

The court found that the November 29 statement was the only direct evidence of the Defendant's state of mind when she gave her November 10 statement. The court noted that the Defendant never mentioned the conditions of her confinement in the visitation booth or threats by law enforcement officers.

The trial court stated that on January 6, 2011, the Defendant told an FBI agent that Mr. Steel forced her to kill the victim but also claimed someone named Helton killed the victim. The court found that the Defendant said she confessed falsely because "she was concerned for her safety and the safety of her children and did not want Helton or others involved to harm them."

The trial court found that no evidence showed that the November 10 statement was the result of threats or promises from the law enforcement officers. The court rejected the Defendant's claim that the police "purposefully" placed the Defendant inside "a small uncomfortable holding cell and purposefully exposed her to threats of her confederates until she confessed." It stated that no evidence showed "such an intent" and that the Defendant's admitted reasons for the confessions did not include the conditions of her confinement. The court noted that the Defendant never mentioned the visitation booth. Regarding the threats the Defendant received from Mr. Steel and Mr. Stokes when she was in confinement, the court noted that the threats did not work because the Defendant talked to the police. The court found that the Defendant received threats regardless of her location inside the jail and that the evidence failed to show the Defendant was purposefully exposed to threats. The court noted the officers' unrebutted testimony that they did not purposefully expose her to threats or place her in the visitation booth to force a confession.

After reviewing the recordings of the Defendant's statements and observing the Defendant's demeanor, the trial court found that although she was emotional and tired at times, she was articulate "in her own way" and responsive to the questions asked. The court noted that she was read her *Miranda* rights often and found that her November 10, 2010 statement was voluntarily.

The Defendant's argument that her statement was involuntary focuses on her confinement between October 29, 2010, and November 10, 2010, in the visitation booth and her receiving threats from Mr. Stokes and Mr. Steel during her confinement. Regarding the pre-confession confinement, the evidence shows that the Defendant was confined to a small visitation booth, measuring 5' by 6', with no toilet, bed, or running water. The evidence shows, though, that the Defendant had frequent contact with correction officers as they walked the hallway. Ms. Wilburn testified that the Defendant only had to request food, water, and use of a restroom. Sheriff Bivens testified that the area was monitored by a video camera, that officers checked on the inmates every thirty minutes, that the inmates were

given water and the opportunity to use the restroom. No evidence shows the Defendant was deprived of these essentials. Likewise, no evidence exists showing that the Defendant ever complained about the conditions of her confinement. The various interviews played at the trial and at the suppression hearing show that the Defendant complained about the officers' failure to help resolve an unrelated simple possession charge. The Defendant never mentioned the conditions of her confinement in the Monroe County Jail. Sheriff Bivens testified that the jail contained more inmates than it was certified to have and that some inmates slept on the floor. He agreed there were more than twice as many female inmates than available beds.

Likewise, no evidence shows that the law enforcement officers placed the Defendant in the visitation booth as a means to obtain a confession. Regarding the "administrative hold, a detective hold," Ms. Wilburn testified that the hold required the Defendant to be separated from other inmates. Detective Brannon denied knowing the Defendant was held in isolation at the jail and said the interview rooms were located across the street from the jail. Jail staff brought her to and from the interview room. Detective Brannon said the hold prevented the Defendant from speaking with other inmates but denied requesting that the Defendant be held in isolation. He testified, too, that the booking sheet from October 29, 2010, showed that the Defendant was charged with failure to appear and stated, "Do not release - Meigs County."

During the November 10 interview, the Defendant was advised of her *Miranda* rights, did not request an attorney, understood the rights, and signed the waiver of rights form. The Defendant did not tell the officers that she had a medical condition that would have prevented her from understanding her rights or the waiver form. The record shows that none of the officers involved in the investigation promised to remove her from the visitation booth if she told the officers what they wanted to hear. Detective Brannon testified that he did not tell the Defendant he could help her with her pending charges, did not threaten her with new charges if she failed to cooperate, and did not threaten to interfere with her bond. We note, too, that the Defendant requested to speak with the officers on several occasions and that the Defendant's full-scale IQ was ninety. We note the Defendant said in her November 4 interview that she had been read her *Miranda* rights "millions of times" and had waived those rights, that she asked to speak to the police, and that the police had not harassed her. As the trial court stated regarding the November 10 interview, the Defendant was articulate and responsive, which is supported by the recording. We conclude that although the Defendant's conditions of confinement were particularly bad at times, the evidence supports the trial court's conclusion that her statements were voluntarily made.

Regarding the Defendant's argument that the officers intentionally confined her in an area where she could be threatened by Mr. Steel and Mr. Stokes as a means to coerce a

confession, no evidence shows the officers investigating the case knew Mr. Steel and Mr. Stokes threatened the Defendant when they were housed in the Monroe County Jail, although the Defendant told the officers during many of her statements that she feared them. The officers knew the Defendant and Mr. Steel had a turbulent relationship. Ms. Wilburn testified extensively about Mr. Steel's threatening the Defendant and the Defendant's fear of Mr. Steel. Although Ms. Wilburn expressed concern to her supervisor about the Defendant's safety, she was not moved. Ms. Wilburn said the threats continued until Mr. Steel was transferred to another facility in October 2011. She recalled an incident when Mr. Steel broke out of his cell and ran into the Defendant's cell. Although she did not recall the details of how Mr. Steel was able to enter the cell, she agreed the incident occurred after November 10, 2010.

Although Ms. Wilburn observed the threats, no evidence shows the law enforcement officers investigating the killing knew of the specific threats or placed her in a position to receive threats in hopes the threats would cause her to confess. Although the Defendant expressed fear of Mr. Steel and Mr. Stokes before the November 10 interview, she did not claim she or her family were threatened until after the November 10 interview. We note that the incident in which Mr. Steel entered the Defendant's cell occurred after the November 10 interview. We note, too, that after the November 10 interview, the Defendant changed her story again, implicating Mr. Stokes and Mr. Steel in the victim's killing. Likewise, Sheriff Bivens testified that he believed the Defendant was safe inside his jail. We conclude that the evidence does not preponderate against the trial court's findings leading to its conclusion that the Defendant's confession was voluntary. We, likewise, conclude that the trial court did not err by denying the motion to suppress. The Defendant is not entitled to relief on this basis.

## IV

The Defendant contends that the trial court erred by not granting a mistrial after TBI Special Agent Barry Brakebill stated on direct examination that the Defendant had a long criminal history. The Defendant argues that evidence of her previous convictions was inadmissible and was only intended to impeach her credibility if she decided to testify at the trial. The State responds that the trial court did not abuse its discretion in denying a mistrial. We agree with the State.

At the trial, the State asked Special Agent Brakebill to explain to the jury the process he used "to set up the taking of" the November 10, 2010 statement. In his lengthy response he stated, in relevant part, that

> we advised her of her rights against self-incrimination, as set out in *Miranda v. Arizona*. She, evidently, has a long history in the criminal justice system.

And she knows those rights probably as well as I do. But she was, once again, gone over those rights and acknowledged that she understood her rights.

The record shows that Special Agent Brakebill continued answering questions, and a recess was granted to give the State time to set up video equipment. During the recess, defense counsel raised the issue. Counsel acknowledged that the State did not elicit Special Agent Brakebill's statement regarding the Defendant's criminal history but requested a mistrial. Counsel argued that it was false that the Defendant had a lengthy criminal history and that the witness had "no business" making the statement. Counsel told the trial court that he did not object at the time of the statement because he did not want to draw attention to it. The court overruled the motion but said it would instruct the jury to disregard the statement if counsel wanted. Counsel asked for the instruction, and when court resumed, the court instructed the jury as follows:

> Now members of the jury, before you left, I think the witness made a statement about the defendant's prior record. And without repeating that statement, I have ruled that statement inadmissible. So I am instructing you to not place any weight on that statement, to not consider that statement as evidence in this case in any way.

A mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

Although the State first argues that the issue is waived for the Defendant's failure to object contemporaneously, the record shows counsel strategically did not object in the jury's presence because he did not want to draw attention to the witness's statement. Counsel made a motion for a mistrial at the break following the witness's statement, and we will consider the issue on the merits.

Although Special Agent Brakebill's statement was inappropriate, the comment did not involve details regarding any previous convictions. As the trial court noted at the jury-out hearing, the statement did not imply that she had previous convictions for "armed robberies or anything too exciting." We note that the statement was not elicited by the State, and the court offered and provided an appropriate curative instruction to the jury. The trial court did

not abuse its discretion by denying the Defendant's request for a mistrial. The Defendant is not entitled to relief on this basis.

V

The Defendant contends that the trial court erred by permitting the State to present witnesses at the trial who were not listed on the indictment. Specifically, she challenges the testimony of Greg Tallent, Susan Clark, Laura Hodge, Steve Scott, Daniel Foster, Don Cogan, Duane Bowling, James Brown, and Paul Cain. She argues the witnesses' testimony violated Tennessee Code Annotated section 40-17-106 (2010). The State responds that the trial court did not abuse its discretion by permitting the witnesses to testify. We agree with the State.

Tennessee Code Annotated section 40-17-106 states,

> It is the duty of the district attorney general to endorse on each indictment or presentment, at the term at which the indictment or presentment is found, the names of the witnesses as the district attorney general intends shall be summoned in the cause, and sign each indictment or presentment name thereto.

The purpose of the statute "is to prevent surprise to the defense." *State v. Wilson*, 164 S.W.3d 355, 362 (Tenn. Crim. App. 2003). Our supreme court has stated that the statute "is directory only and does not necessarily disqualify a witness whose name does not appear on the indictment from testifying." *State v. Harris*, 839 S.W.2d 54, 69 (Tenn. 1992). "Evidence should not be excluded except when the defendant is actually prejudiced by the failure to comply with the rule and when the prejudice cannot otherwise be eradicated." *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000).

Regarding Officer Tallent's testimony, counsel objected to his testifying at the trial because he had "never heard of this witness." The prosecutor stated that the witness was the first responder to the scene and that his report was in the State's discovery package. Counsel did not dispute that the report was in the discovery package. Officer Tallent testified about his arrival at the scene and his efforts to secure the scene until other officers arrived. The officer's report provided the Defendant notice of his involvement in and knowledge of the case. The Defendant has failed to show that any prejudice resulted from the State's failure to include his name on the indictment.

Regarding the testimony of TBI Forensic Technicians Susan Clark, Laura Hodge, and Steve Scott and State Fire Marshals Daniel Foster and Don Cogan, counsel objected to their testimony because the witnesses "were not listed . . . anywhere" by the State. Counsel admitted, though, that he had the witnesses's respective reports. The prosecutor stated that all the witnesses were subpoenaed and argued he was entitled to call them as witnesses because their reports were in the discovery package and their testimony was relevant.

Counsel argued the State had a duty to list the witnesses' names on the face of the indictment. Counsel said the indictment only listed five names, although he received a four-page list of names in the discovery package. Relying on *Canady v. State*, 461 S.W.2d 53 (Tenn. Crim. App. 1970), the trial court found that the issuance of a subpoena provided sufficient notice of the State's intent to call a witness at a trial. The court noted that Code section 40-17-106 was "directory only." The court told counsel that "if there [was] a . . . smoking gun witness that is a surprise," counsel should bring it to the court's attention. It stated that the court would provide counsel the opportunity to "interview the witness or whatever, but there [would] be no exclusion of witnesses for a violation of that statute."

The record shows that each witness was subpoenaed to testify and that their reports were contained in the State's discovery package. *See Canady*, 461 S.W.2d at 61 (concluding that the witnesses not listed on the indictment were rightfully permitted to testify because the State subpoenaed each witness, which provided "ample time" for the defendant to "ascertain their identities and talk with them" before the trial). We conclude that the Defendant has failed to show prejudice and that the trial court did not abuse its discretion by permitting the State to call the relevant witnesses.

Regarding the testimony of Duane Bowling, James Brown, and Paul Cain, we note that the Defendant failed to object contemporaneously to their testimony. *See* T.R.A.P 36(a); Tenn. R. Evid. 103. In any event, Mr. Bowling testified regarding his having breakfast with the victim on the day of the murder and the victim's stating that he "ran into something" and needed to take care of it. Monroe County Administrator of Elections James Brown testified that the victim was at the election commission office at 1:00 p.m. on the day of the murder and that the victim paid for lunch with cash from his money clip. Mr. Cain testified regarding Mr. Steel's owing him forty dollars, Mr. Steel's offering to pay the money owed shortly after the murder, the Defendant's asking him to install new windows, and the Defendant's showing him "a decent wad of money" that was rolled up. The record shows that counsel impeached Mr. Cain by inquiring about criminal charges related to a methamphetamine laboratory on his property. Likewise, Mr. Cain said that although he did not know how much money the Defendant had, it was not thousands of dollars. We conclude that the Defendant has failed to show prejudice and that the trial court did not abuse its

discretion by permitting the witnesses to testify at the trial. The Defendant is not entitled to relief on this basis.

## VI

The Defendant contends that the trial court erred by not permitting the Defendant to play in its entirety the video-recorded November 3, 2010 statement in the interest of time and by failing to grant a mistrial. She argues that the manner of questioning and the delivery of the Defendant's answers were not "translated through" the narrative and that the probative value of the recording "was in its totality." She also argues the recording provided a sense of the circumstances under which she made the statement. The State responds that the trial court acted within its discretion regarding the publishing of the Defendant's statement and properly denied her motion for a mistrial. We conclude that the Defendant is not entitled to relief.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The decision to admit video recorded evidence "is within the discretion of the trial court and will not be reversed absent a clear showing of an abuse of discretion." *State v. McCray*, 922 S.W.2d 511, 515 (Tenn. 1996). "An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007) (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

The record shows that after the recording of the November 3, 2010 interview had played for about fifteen minutes, the trial court asked counsel to approach the bench. The court stated that it was making a Rule 403 inquiry about waste of time. The court asked if there was "a point to listen to this whole thing" if the narrative would suffice. The court asked if the jury was going to learn anything from listening to the almost three-hour recording. The court said that it was "not so interested in brevity that it want[ed] to prejudice either side" but that it wanted to save the jury time if possible. Counsel conferred with his "defense team" but said he had not had time to make a decision regarding whether the narrative would suffice. The court asked if helpful evidence existed in the recording but excluded in the narrative, and counsel replied, "Yes." Counsel said the manner in which the police got the Defendant to talk about the killing was not portrayed in the narrative. Counsel admitted that he had not anticipated the court's question and could not answer the question

completely at that moment. The court stated it was going to exercise its authority under Rule 403 and instruct the jury that the detective prepared a narrative of the interview that would give them "an idea what was said during the interview." The court told counsel that it would permit the defense to present the recording if the defense concluded that the jury needed to hear it or it would be prejudicial for the jury not to hear it.

After the bench conference, the trial judge instructed the jury that it had

made the decision that we – [it's] not necessary for you to listen to this and watch this entire tape, that you already have a flavor to it. And as you will learn here, momentarily, there is a somewhat lengthy narrative done by the detective that will give you a good overview of this statement.

So in the – to save a little time, I have decided that it's really not necessary for you to listen to this entire three hours. I have given the defense an opportunity during their proof, if there's a portion of this tape which they think is important for you to watch, that they'll be given an opportunity to show it to you.

But, I do want to not diminish the importance of this, it's just that I don't think you're going to learn much more about this three-hour interview than what you've already seen by the flavor of the first 15 minutes and what you're going to learn from the detective from this rather detailed narrative. So that's the Judge's decision regarding this[.]

The following day of the trial, counsel raised an issue regarding the trial judge's stating that the November 3 statement was "not important." The judge stated that he hoped he did not use those words and that he hoped he did not "say it like that." Counsel thought the judge said "not important" and requested a mistrial. The judge stated, "Well, if I said that, I'll just un-say it to the jury." The judge denied the motion for a mistrial and said he would clarify his comments to the jury. The judge said that "it was an effort to spare them what the Court felt was redundant evidence." The court noted for the record that it was told the narrative was accurate and that it would permit counsel to play excerpts of the recording if necessary to illustrate the demeanor of the interview. Counsel noted his concern that the narrative showed what the officer thought was important, not necessarily that the narrative was correct.

When court resumed, the trial court instructed the jury as follows:

Let me mention one thing. Yesterday, you started to watch a statement that was, we had been told, was three hours long. And, I think, 15 minutes in, I stopped it and then explained to you that it would continue in the same vein and that we had other options to bring you the relevant information, including Mr. Brannon's summary and then the possibility which I gave the defense of putting in excerpts from that if they thought that there was some important information missing from what they were offering through the detective.

Now, the defense lawyer tells me, and I don't remember this, but I'll take him at his word, that I told you that the evidence perhaps wasn't very important. Well, obviously, if I said that, I certainly didn't mean to say that. And if I said that, just strike that from your consideration.

That evidence of that particular statement was presented to you in the context of all the other statements and should be considered by you consistent with the jury instructions that you will receive about the confessions or statements against interest. So I wanted to make that clear. And if I misspoke and said that it wasn't important, that is certainly incorrect.

The Defendant was later permitted to play excerpts from the recording pursuant to the court's ruling. The excerpts totaled thirty-six minutes of the approximate three-hour interview.

Regarding the trial court's limiting the playing of the video-recorded statement, we note that the recording was received as an exhibit and not excluded as evidence. The evidence was readily available for the jury to view during its deliberations had it chosen to view it. *See* Tenn. R. Crim. P. 30.1 (permitting the jury to take to the jury room for examination during deliberations all exhibits and writings, except depositions). The State notes that the issue is not the exclusion of the video recording under Rule 403 but the manner in which the exhibit was published to the jury. The Defendant's argument centers not on the substance of the interview but rather the "demeanor of [the defendant] during the interview" and the surrounding circumstances under which she made the statement. The Defendant's demeanor and circumstances surrounding the statement were shown in the excerpts the Defendant played at the trial. The record fails to show that the court limited the Defendant's choice of excerpts played for the jury. We conclude that the court did not abuse its discretion by publishing the exhibit by way of the narrative in the interest of time. The court did not exclude the evidence but required a time-efficient manner of presenting the evidence and permitted the Defendant to present excerpts of the recording.

Regarding the motion for a mistrial, the record shows that the trial court first instructed the jury that it was "not necessary" for the jury to listen to the entire recording and that in the interest of time, the jury would be provided a narrative, or summary, of the interview. The court noted that it had given the defense the opportunity to play portions of the recording it thought were important for the jury to view. The court also stated that it did not want to "diminish the importance of this, it's just that I don't think you're going to learn much more" after viewing the first fifteen minutes. Counsel thought the court told the jury that the evidence was "not important." Out of an abundance of caution, the court instructed the jury that it did not intend to convey the sentiment that the recording was unimportant and to "strike that from your consideration." The court stated that the recording should have been considered "in the context of all the other statements" and "consistent with the jury instruction" regarding confessions and statements.

The trial judge provided an instruction clarifying his statements regarding the reason for his limiting the viewing of the recording and explicitly stated that he did not mean to say the evidence was unimportant. Any misunderstanding was corrected by the subsequent jury instruction. We conclude that the trial court did not err by denying the motion for a mistrial and that the Defendant is not entitled to relief on this basis.

## VII

The Defendant contends that the trial court erred by limiting the testimony of Dr. Kathryn Smith. She argues that the trial court's limiting Dr. Smith from discussing her opinion regarding whether the Defendant provided reliable information in her numerous police interviews was unreasonable, illogical, and resulted in an injustice. She also argues that the limitation prohibited Dr. Smith from adequately expressing her opinion that the Defendant had an impaired ability to exercise sound judgment during her police interviews. The State responds that the trial court did not abuse its discretion by limiting the expert testimony. We conclude the Defendant is not entitled to relief.

Tennessee Rule of Evidence 702 states, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness, qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Rule 703 states,

> The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular

field in forming opinions or inferences upon the subject, the facts or data need
not be admissible in evidence[.]

Determinations about the admissibility of expert testimony are within the sound discretion
of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). The standard of
review is whether the court abused its discretion, and in order to reverse a court's ruling, this
court must determine that the court "'applied an incorrect legal standard, or reached a
decision which is against logic or reasoning that caused an injustice to the party
complaining.'" *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting *State v. Shuck*, 953
S.W.2d 662, 669 (Tenn. 1997)).

The record shows that the Defendant made an offer of proof regarding Dr. Smith's
testimony. Dr. Smith testified consistently with her trial testimony regarding the forensic
psychological evaluation she performed, the tests she administered, the Defendant's history
of sexual and physical abuse and neglect, CPS's involvement in the Defendant's childhood,
the Defendant's going into "state custody" several times throughout her childhood, and her
first psychiatric hospitalization at age eight.

The trial court interrupted and said that the offer of proof was not for the sentencing
hearing but regarding the two aspects of the psychological profile that might be admissible
in the context of the Defendant's confession. The court said it was interested in Dr. Smith's
testing, the Defendant's IQ, whether the Defendant was diagnosed with any mental health
conditions, and whether the Defendant was susceptible to suggestion.

Dr. Smith testified consistently with her trial testimony regarding the Defendant's
mental health conditions and said that her chronic and severe conditions made her "a
disturbed individual psychologically." She said the Defendant had "low average to average
intelligence" and had a "very high" level of emotional instability, which had a detrimental
effect on her cognitive process, although her "IQ [was] okay." She said her cognitive
functioning was undermined by her emotional "chaos." She said the amount of fear and
anxiety she experienced, her poor judgment associated with borderline personality disorder,
and her "coming off" methamphetamine left the Defendant unable to think in a logical and
coherent manner, process information adequately, and pay attention to things of importance.
She said the Defendant's psychological problems were related to her lifelong history of abuse
and neglect by people with power over her.

Dr. Smith testified regarding the Defendant's police interviews that the Defendant did
not know to advocate for herself or to question what was happening. She said that the
Defendant did not know how to consider and to reflect on a situation and that her thoughts
were disorganized and impulsive.

Dr. Smith testified that the Defendant only mentioned the visitation booth in passing and that after Dr. Smith obtained information regarding her housing conditions at the local jail, she thought it was "striking about her failure to emphasize the conditions she was in and make the connection between the things that she said to investigators and the conditions of her confinement." She learned the Defendant received threats against her family while in confinement and said the threats would have further incapacitated her cognitive abilities. She said the Defendant was living in fear, which was compounded by her history showing "horrible things" were done to women and children.

Dr. Smith testified that the repeated police interviews were "a wearing down process." She said that when the Defendant was not in confinement, the Defendant routinely used methamphetamine and marijuana. She said that if the Defendant were under the influence during her police interviews, her ability to exercise judgment and think rationally would have been compromised.

On cross-examination, Dr. Smith testified that her testimony was not focused on whether the Defendant's mental condition would have affected her ability to form the required intent for the crimes with which she was charged. She agreed she was not a false confession expert. She said the information she received regarding the conditions of the Defendant's confinement came from the Defendant initially and later from photographs of the cell. She said her information showed the cell was 5' by 5'. When told the cell was "70 by 37" based on previous testimony, she denied the information would change her analysis because the Defendant was alone at least part of the time and was unable to speak to others. She said it was "striking" to her that the Defendant did not complain about the conditions of her confinement, although the Defendant complained routinely about being in confinement generally. She denied knowing the Defendant was housed outside the visitation booth three days per week.

Upon examination by the trial court, Dr. Smith testified consistently with her suppression hearing testimony regarding the Defendant's IQ and agreed that the Defendant's logic was chaotic, compromised, and unstable and that the conditions of her confinement, repeated interrogations, and threats would have increased the level of chaos. Regarding suggestibility, Dr. Smith stated that because of the "off the charts" abuse and neglect she suffered throughout her life by people with power, the Defendant had learned to "adapt to the people who have the power over her." The court told Dr. Smith to ensure the jury understood that she did not think law enforcement abused the Defendant when she was a child. Dr. Smith agreed the abuse was by the Defendant's family members and said the abuse altered the Defendant's personality. She said that the Defendant was always alert to danger and adapted herself in predictable ways by listening to the comments of other people. She said that when the police told the Defendant, "That's not what happened," she attempted

to talk about her experiences and eventually said, "Okay," when the police doubted her version of events.

The trial court found that the Defendant was entitled to present psychological evidence of the particular personality traits and mental conditions that made the Defendant more susceptible to suggestion than other persons and evidence about a mental process that would result in unreliable information being provided. It found that Dr. Smith could not state an opinion regarding a "specific judgment or opinion of a particular confession in this case or the interview techniques used." The court stated that Dr. Smith could testify regarding the Defendant's suggestibility and personality profile and Dr. Smith's diagnoses but that she could not testify regarding the specific conditions of confinement, specific threats, or the number of repeated interviews. The court found that Dr. Smith could testify generally regarding how conditions of confinement, threats, and repeated questions by authority figures would increase the Defendant's chaos.

In *State v. Ted Ormand Pate*, No. M2009-02321-CCA-R3-CD (Tenn. Crim. App. Nov. 22, 2011), *perm. app. denied* (Tenn. Apr. 11, 2012), the trial court limited the defense's expert testimony in similar fashion as the court in the present case. In *Ted Ormand Pate*, the trial court prohibited testimony "connecting the mental condition and personality traits of the [D]efendant to the issue of whether the [D]efendant ha[d] a propensity to make a false statement." Slip op. at 14. This court concluded that

> a defendant may introduce expert psychological testimony "bearing on his or her ability to respond reliably to interrogation" as long as the expert offered information outside the jurors' usual human experience and did not comment on "the expert's judgment on the defendant's reliability in the specific instance of the confession submitted for the jury's consideration."

*Id.*, slip op. at 15 (quoting *State v. Oliver*, 124 P.2d 493, 508 (Kan. 2005), *overruled on other grounds by State v. Anderson*, 197 P.3d 409 (Kan. 2008)). In applying this standard in *Ted Ormand Pate*, this court concluded that the trial court abused its discretion because the court permitted the expert to testify regarding the defendant's particular personality traits and mental conditions that made the defendant more susceptible to suggestion than other people and permitted the jury to determine the credibility of the defendant's statements at issue. *Id*.

In *State v. Ackerman*, 397 S.W.3d 617 (Tenn. Crim. App. 2012), the trial court excluded the defendant's expert's testimony entirely. The expert was prepared to testify that the defendant "was vulnerable to suggestion and that this vulnerability 'could help explain why' the defendant" made admissions to his daughter and to the police. *Id.* at 631. The expert did not intend to offer an opinion regarding the accuracy of the statements or whether

-72-

the defendant was more or less likely than other people to provide false information. *Id.* at 632. Although in *Ackerman*, this court stated that it agreed with *Ted Ormand Pate* that expert testimony regarding "a defendant's susceptibility to suggestion could be admissible," it concluded that the trial court did not abuse its discretion by excluding the expert testimony because the testimony might have confused the issues. *Id*.

We conclude that the trial court did not abuse its discretion by limiting Dr. Smith's testimony to the Defendant's particular personality traits and mental conditions that made her more susceptible to suggestion than other persons and to her mental process that would result in her providing unreliable information. Likewise, the trial court did not abuse its discretion by prohibiting Dr. Smith from rendering an opinion regarding whether the Defendant provided false or truthful information during a specific interview, as Dr. Smith testified she was not qualified to render such an opinion. Although the court ruled that Dr. Smith could not testify regarding the specific conditions of confinement, specific threats, or the number of repeated interviews, she testified extensively regarding the Defendant's long-term history of sexual abuse, physical abuse, and neglect and the deplorable conditions in which she lived as a child. She discussed the Defendant's IQ and her numerous psychological disorders. Dr. Smith diagnosed the Defendant with post-traumatic stress disorder, severe major depression with psychotic features, dysthymic disorder, which was a "low grade" form of episodic and chronic depression, and borderline personality disorder. She said that the trauma the Defendant experienced as a result of the sexual assaults and physical abuse led to the post-traumatic stress disorder diagnosis and that the Defendant lived in a chronic state of anxiety. She, likewise, discussed the Defendant's drug use and relationship with Mr. Steel.

Regarding the Defendant's ability to exercise reasonable judgment when interviewed by persons in a position of authority, Dr. Smith testified that the Defendant's diagnoses affected her thought processes by making them "much less efficient." She said it was difficult to think when chronically anxious, depressed, and detoxifying from methamphetamine. Dr. Smith testified that the Defendant received threats when in confinement and that the trauma the Defendant suffered previously caused her to process the threats differently. She concluded that the Defendant did not perceive the threats as idle, that her ability to think was limited, and that she was without "higher order cognitive functioning," which involved planning and consideration of consequences. Dr. Smith concluded that because of the Defendant's psychological disorders, the Defendant's being confined in the visitation booth and in isolation would have had "an even greater detrimental effect." She said that long-term confinement in the visitation booth would have caused her level of distress to increase and that over time, fatigue would have further affected her ability to think, plan, and reason. She concluded that because of the Defendant's history of abuse, she was more vulnerable to do or say what someone wanted. She said the Defendant had determined how to adapt herself in situations where someone had power over her, had

learned to determine what people wanted to hear, and had learned to satisfy someone with power over her.

The expert testimony was consistent with *Ted Ormand Pate* in that Dr. Smith provided the jury information to determine the reliability of the Defendant's statements to the police without Dr. Smith's providing her professional opinion regarding the Defendant's truthfulness in a specific interview. The Defendant is not entitled to relief on this basis.

## VIII

The Defendant contends that the trial court erred by denying her *ex parte* motion for funds to secure an expert witness in the field of coerced or false confessions and an expert in the field of polygraph examinations. She argues that a determination of whether her confession was coerced was critical because the State's case was based almost exclusively, if not exclusively, on her confession. The State responds that the issue is waived for failure to provide an adequate record on appeal. We agree that the Defendant is not entitled to relief.

This court unsealed documents related to the Defendant's *ex parte* motions for funds for expert services. *See State v. Jessica Kennedy*, No. E2013-00260-CCA-R3-CD (Tenn. Crim. App. June 5, 2013) (order). The Defendant's first motion for funds for an expert in the field of coerced confessions stated that obtaining an expert was a necessity because the evidence raised the issue of whether the Defendant's confessions were voluntary and reliable. The motion stated that the Defendant was interviewed by multiple law enforcement officers on seven occasions but did not make incriminating statements until the fifth interview. The motion alleged that the Defendant was under the influence of methamphetamine or the symptoms of withdrawal during some of the interviews, that she was held in solitary confinement and only removed from her cell to be interviewed by the police, and that she was threatened by persons inside and outside the jail, including police officers.

The trial court entered an order denying the Defendant's request for funds for an expert in the field of coerced confessions. The order stated that the court had previously granted the Defendant funds for a mitigation investigator and a psychologist, which was to investigate the Defendant's "mental capacity and will" regarding the confessions. The order also stated that the judge was capable of determining whether a confession was voluntary and found that expert testimony was unnecessary. The order states that the motion was heard in chambers on September 15, 2011, but a transcript of the hearing is not included in the appellate record.

The Defendant subsequently filed a renewed *ex parte* motion for funds for an expert on coerced confessions, alleging that the Defendant had been interviewed more than twelve times, several in the early morning hours. The motion stated that the Defendant was not provided *Miranda* rights until the next-to-last statement in which she made incriminating statements, that the Defendant was held incommunicado, that the Defendant implicated local law enforcement officers in the killing, and that the Defendant had received threats. The motion stated that counsel needed an expert in the field of coerced confessions to help investigate and prepare the motion to suppress. Specifically, counsel wanted an expert to analyze the methods and techniques used by law enforcement. The record does not show that a hearing was held on the second request, but the trial court filed an order denying it.

The Defendant filed a third *ex parte* request for funds for an expert on coerced confessions asking the court to reconsider its previous denials. She included information regarding Dr. Smith's identifying "a number of areas or factors which could/may/do apply, which would indicate that Ms. Kennedy's confession was not reliable" but stated Dr. Smith was not qualified to make a conclusion. In Dr. Smith's affidavit, she identified the factors she believed called into question the validity of the Defendant's confessions, which included the lengthy interrogations, the Defendant's being under the influence of drugs, her post-traumatic stress disorder and history of multiple traumas, her fear for her safety, and the confession being the only evidence implicating her in the murder.

The trial court entered an order denying the Defendant's third request for funds for an expert in coerced confessions. The order states that an *in-camera* hearing was held and that a court reporter was present. We note that a transcript of the hearing is not included in the appellate record. The motion was denied on the grounds stated on the record. The order stated, too, that counsel "already ha[d] a psychologist who could provide the Court with a personality profile/mental health history of the Defendant."

Regarding funds for an expert in the field of coerced confessions, the record shows that two *in-camera* hearings were held, but the record does not include transcripts from the hearings. In the final order denying the Defendant's last motion, the trial court stated that the motion was denied, in part, based on the findings it made during the hearing. We note that a court reporter was present for this hearing. The Defendant bears the burden of providing an accurate and complete account of what occurred in the trial court. T.R.A.P. 24(b). Further, without a record of the trial court's findings of fact and conclusions of law, this court "cannot consider the merits of the issue." *See State v. Ballard*, 855 S.W.2d 557, 561 (Tenn. 1993); *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990) (concluding that "an appellate court is precluded from considering an issue when the record does not contain a transcript or statement of what transpired in the trial court with respect to

that issue"). We presume that the trial court's ruling was correct. *See Draper*, 800 S.W.2d at 493.

Regarding funds for a polygraph expert, the record fails to show that the Defendant requested funds for a polygraph expert before the trial. As the State correctly notes, polygraph evidence is inadmissible in Tennessee. In any event, the Defendant has not argued that any funds would have been used to present polygraph evidence at the trial. Rather, the Defendant argues in her brief that the funds would have been used to analyze the reports and examinations of the numerous people who submitted to a TBI polygraph test. The record fails to show, though, that the Defendant requested funds for a polygraph expert before the trial. The Defendant cannot raise the issue for the first time on appeal. *See State v. Turner*, 9191 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995).

## IX

The Defendant contends that the trial court erred by overruling her motions to dismiss and to disqualify the prosecutor and the district attorney general's office. The Defendant argues that the motions were justified because the State failed to comply with Tennessee Rule of Criminal Procedure 16 and *Brady v. Maryland*, 373 U.S. 83 (1963), which prejudiced her ability to prepare her defense. The State responds that the trial court did not abuse its discretion by denying the Defendant's motions. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). Accordingly, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87. Our supreme court has said, "[T]he evidence must potentially posses exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013) (citing *State v. Ferguson*, 2 S.W.3d 912, 915-18 (Tenn. 1999)).

Tennessee Rule of Criminal Procedure 16(a)(1)(A) states,

Upon a defendant's request, the state shall disclose to the defendant the substance of any of the defendant's oral statements made before or after arrest in response to interrogation by any person the defendant knew was a law enforcement officer if the state intends to offer the statement in evidence at the trial.

Likewise, Rule 16(a)(1)(B)(i) states, in relevant part,

> Upon a defendant's request, the state shall disclose to the defendant, and make available for inspection, copying, or photographing, all of the following: (i) the defendant's relevant written or recorded statements, or copies thereof, if: (I) the statement is within the state's possession, custody, or control; and (II) the district attorney general knows – or through due diligence could know – that the statement exists[.]

Rule 16(d)(2)(A)-(D) states that when a party fails to comply with the rules of discovery, the trial court is permitted to order discovery or inspection with a specified time, place, and manner, to prescribe "other just terms or conditions," grant a continuance, prohibit the use of undisclosed evidence at the trial, or enter an order "as it deems just under the circumstances." The State's "duty to disclose extends not only to material in his or her immediate custody, but also to statements in the possession of the police which are normally obtainable by 'exercise of due diligence,' that is, a request to all officers participating in the investigation or preparation of the case." *State v. Hicks*, 618 S.W.2d 510, 514 (Tenn. Crim. App. 1981) (quoting *United States v. Bryant*, 439 F.2d 642, 650 (D.C. Cir. 1971)). Furthermore, "there [is] no duty on the defense attorney to seek out [law enforcement officers] in order to obtain a copy of his client's statement." *Id*. After a discovery request is made, the burden is placed on the prosecutor "to use reasonable diligence prior to and during the trial to discover the existence of a statement and to provide the defendant with an opportunity to inspect and copy it." *Id*.

Our supreme court has concluded that Rule 16(d)(2)(D) permits a court to dismiss the indictment after failure to comply with a discovery request or order. *State v. Collins*, 35 S.W.3d 582, 585 (Tenn. Crim. App. 2000); *see State v. Freseman*, 684 S.W.2d 106, 107 (Tenn. Crim. App. 1994). Although Rule 16 permits the dismissal of the indictment, "the Rule provides the court with many other methods for assuring compliance without resorting to such extreme measures." *State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008). Trial courts are vested with "wide discretion in fashioning a remedy for non-compliance" of the rules of discovery, "and the sanction should fit the circumstances of the case." *Id*. (citing *Collins*, 35 S.W.3d at 585).

The decision to disqualify a prosecutor or the district attorney's office "rests in the sound discretion of the trial judge." *State v. Tate*, 925 S.W.2d 548, 549 (Tenn. Crim. App. 1995). Appellate review of a trial court's decision in this regard is limited to determining "whether there has been an abuse of the discretionary authority afforded the trial court." *Id*. at 550 (citing *State v. Phillips*, 672 S.W.2d 427 (Tenn. Crim. App. 1984)).

The record shows that on September 9, 2011, the Defendant filed her first discovery and *Brady* requests. The State offered counsel the opportunity to review the prosecution's file, as the district attorney had an open file discovery policy. By December 12, the Defendant had received some but not all the requested materials. On December 12, the Defendant filed subsequent requests for discovery. The record shows that the trial court entered a December 22, 2011 order, after a hearing on the Defendant's requests. Although a transcript of the hearing is not included in the appellate record, the order required the State to comply with any outstanding discovery and *Brady* requests by February 1, 2012. Defense counsel and the prosecutor scheduled a meeting on January 12 in order for counsel to review Special Agent Brakebill's and Detective Brannon's files, but they did not attend the meeting and no discovery or *Brady* materials were provided to counsel.

The State claimed that it had in good faith attempted to provide counsel with the requested materials but the officers were unable to attend the January 12 meeting because they "were assigned and occupied with other duties." The State claimed that the information at issue had been requested from the TBI agent in charge but that the information was in the central archive Chattanooga facility. Regarding TBI Agent Jason Legg's summaries, the State said the information could not be obtained until the agent returned from training in Virginia. The State claimed that all the Defendant's statements had been provided to counsel. Regarding the polygraph information, the State instructed counsel to make an appointment with TBI Agent Fry, who conducted the examinations. Regarding the FBI records, the State claimed it did not have the authority to compel production of those records. Regarding the Monroe County Sheriff's Office records, the State said the materials could be reviewed upon making an appointment with Detective Brannon. Regarding the Defendant's cell phone, the State said that the phone was in evidence and that counsel could schedule an appointment to view the phone to preserve the chain of custody.

At an April 2, 2012 hearing, the prosecutor offered to meet with counsel and Detective Brannon and allow counsel to review the Monroe County Sheriff's Office file. Regarding the polygraph information, the prosecutor told the court that counsel would have to meet with the TBI Agent who performed the tests and that he would attempt to have the agent meet with counsel at the same time counsel met with Detective Brannon. Counsel stated that he was told everything he had requested would be in Detective Brannon's file. The court wanted the discovery matters resolved by the end of the following week.

On April 19, 2012, the Defendant filed another discovery request for Defendant's cell phone and for the State to identify the location of the murder because law enforcement refused to identify the scene. The State responded on April 25, that the Monroe County Sheriff's Office did not have the cell phone in its possession and that the cell phone provided by the Defendant was returned to her. Regarding the scene of the crime, the State responded

that the discovery materials showed the killing occurred at the yellow house on Head of the Creek Road.

The Defendant filed a motion to dismiss, or in the alternative, motion to show cause. In the motion, counsel stated that he and the defense investigator met with the prosecutor, Detective Brannon, and Sheriff Bivens on April 10, 2012, to review the Monroe County Sheriff's Office file. At the meeting, counsel was provided numerous documents and recorded statements not previously given to counsel. Counsel noted that the Defendant's statements provided at the meeting were the subject of the motion to suppress and were received "barely three weeks before" the hearing on the motion. Counsel argued that the statements were created in the fall of 2010 and should have been provided much earlier.

At the hearing, the prosecutor stated that although counsel had been permitted to review the district attorney general's file, the TBI and the Monroe County Sheriff's Office had their own files, which contained information not necessarily in the State's file. The prosecutor said it simply depended upon what the law enforcement agencies forwarded to him and offered to schedule a meeting for counsel to meet with the TBI and the Monroe County Sheriff's Office to ensure counsel had all discoverable and *Brady* information. The prosecutor argued that it had in good faith attempted to comply with the Rule 16 and *Brady*. Counsel informed the court that although the prosecutor only submitted two recordings in his first discovery package, multiple recordings existed at that time.

The trial court denied the motion to dismiss the indictment and found that the State did not have the intent to deceive. The court addressed the prosecutor directly,

> I mean it strikes me that anybody who looks at Rule 16 knows from the very get go, gosh, transcripts, recordings, videos of statements, . . . need to go. I mean that's like the basic Exhibit A of discovery in a criminal case, and if you've been frustrated, and perhaps you have, and perhaps you are being diplomatic here by the failure to get some of this information from the Sheriff and the TBI, if that's the case, and give it on to the defense, I just want to be assured from you that there's nothing else out there. . . .

At the April 25 hearing, there was discussion about the Defendant's cell phone, and counsel was permitted to look at the Defendant's personal belongings to determine if the cell phone was there. Regarding the location of the murder, counsel told the trial court that Detective Brannon refused to tell counsel where he thought the killing occurred. The prosecutor described the location of the murder. Counsel told the court that the location of the house was important because a re-enactment was done there. Counsel wanted a copy of

the re-enactment recording. The prosecutor said that if a recording existed, it was in the possession of the TBI. The court ordered that the recording be produced within ten days.

On May 7, 2012, the Defendant filed a subsequent discovery request regarding the location, time, and date of the killing because the State expressed disagreement with the location identified by the Defendant. A May 9, 2012 order states that counsel misunderstood the State's position regarding the location of the killing but ordered the State to identify the time, date, and location of the killing within seven days. The State complied with the order.

On August 3, 2012, the Defendant filed a motion to disqualify the prosecutor and the district attorney general's office. In her motion, she outlined the various motions and requests for discovery and *Brady* material and stated that she continued to receive information, although the prosecutor previously stated that counsel had all discovery. Counsel stated that after the hearing on the motion to dismiss the indictment, counsel obtained yet another recorded statement dated November 4, 2010, and claimed that the defense would not have received it had counsel not asked for the re-enactment recording at the hearing. Counsel said that he learned at the suppression hearing that TBI Agent Legg possessed another of the Defendant's recorded statements. Counsel noted that he learned some of the victim's personal items, including two rings, were recovered at the scene and that the victim's money clip was recovered from Mr. Nipper, although the prosecutor never mentioned it. Detective Brannon told counsel that the clip was related to Mr. Nipper and unrelated to the Defendant's case. Counsel argued the district attorney general's office's actions continued to deprive her of a fair trial.

The trial court denied the motion to disqualify the district attorney general's office. In the order, the court discussed the available remedies for violating Rule 16 and *Brady* and stated an appropriate remedy would include "the prohibition from introduction of previously undisclosed evidence" or "perhaps a jury instruction imposing negative inference for failure to produce." The court stated, "Whatever the violation, if any, the remedy is not disqualification of the District Attorney and/or his staff." The court permitted defense counsel to address the allegations on August 13, 2012. However, the record does not contain an order or a transcript of any proceeding from August 13.

We note that at the suppression hearing on July 25, 2012, TBI Agent Legg testified that he possessed a recording of his November 29, 2012 interview with the Defendant. Counsel told the court that he was unaware of that interview. The prosecutor replied that counsel knew of the recording because counsel had previously requested it. Agent Legg testified that he never gave the recording to the prosecutor but gave it to Special Agent Brakebill. The prosecutor stated that although he did not know what happened to the recording, he knew it was never received by the district attorney general's office. The

prosecutor stated that he had asked for the recording and that he did not know anything else to tell the court. Counsel asked the court to hold the prosecutor in contempt of court, but the court denied the request. The court found no evidence that the prosecutor acted improperly. The court said "it strikes me this is inefficiency with the TBI and not very impressive on the part of the [TBI] when a statement is taken from a criminal defendant and is not turned over to the District Attorney General's office. . . ."

The record shows that the defense was not provided discoverable evidence at the time of its first requests for discovery and *Brady* material, although the evidence existed long before the requests were made. Although the prosecutor claimed that the State's file was complete and that his office operated under an open-file discovery policy, the record shows the State's file was anything but complete. As the State notes in its brief, the rules of discovery placed an obligation on the prosecutor to disclose information in the possession of the TBI and the Monroe County Sheriff's Office, regardless of whether the State's file contained the information. Although it is not clear why the TBI and the Sheriff's office failed to provide all the recordings, summaries, and transcripts of the Defendant's statements, they were discoverable at the time of the Defendant's request.

We conclude, though, that the record fails to show that the prosecutor acted in bad faith or intentionally withheld discoverable and exculpatory evidence. The record shows that the prosecutor requested the documents sought by the defense after learning of their existence. We conclude that the trial court did not abuse its discretion by denying the motion to disqualify the prosecutor and the district attorney general's office. Likewise, we conclude that the Defendant was not prejudiced by the delay in obtaining the recordings and documents. The record fails to show that the Defendant did not have the relevant recordings and documents before the trial. To the contrary, many of the items were presented by the Defendant at the trial. We conclude that the trial court did not abuse its discretion by denying the motion to dismiss the indictment. The Defendant is not entitled to relief on this basis.

## X

The Defendant contends that the trial court erred during sentencing and argues that the court misapplied enhancement factors related to the value of the loss of property, the victim's being a valuable member of the community and his family, and the emotional toll of the killing. She also argues that the court failed to consider mitigating factors related to the Defendant's assisting in the police investigation and in assisting the police in arresting Mr. Stokes and Mr. Steel on unrelated criminal charges. The State responds that the trial court did not abuse its discretion in sentencing the Defendant to twenty-two years and properly applied the mitigating and enhancement factors. We conclude that the Defendant is not entitled to relief.

A length of a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d 68 at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

At the sentencing hearing, Danny Isbill testified that he prepared the presentence report, which was received as an exhibit. The report showed that the Defendant was previously convicted in Indiana of battery, battery resulting in bodily injury, possession of marijuana, and purchasing more than three grams of pseudoephedrine in one week. The report showed previous Tennessee misdemeanor convictions for drug possession and two counts of possession of schedule VI drugs. The report showed that at the time of the present offenses, the Defendant was on probation for simple possession and that a pending probation violation warrant existed.

The Defendant had no known gang affiliation and graduated from high school. She reported her mental and physical health as fair and admitted using methamphetamine from age fourteen until her incarceration and using marijuana from "a young age" until her incarceration. She reported using heroin when she was a teenager. In describing her family life, she said, "It's been a long, rough road."

Monroe County Sheriff Bill Bivens provided a statement for the presentence report. In the statement, he said the community was shocked by the victim's death because the victim was a community leader and businessman. He said multiple law enforcement

agencies devoted an inestimable amount of resources to the investigation. Sheriff Bivens acknowledged others were involved in the killing but could not prove their involvement. He asked for the maximum sentence.

The victim's family told Mr. Isbill that the victim's car was destroyed completely by the fire and that it would cost $30,000 to replace. The victim's family did not request any additional restitution.

Several victim impact statements were attached to the presentence report, including statements from William E. Howe, III, a local real estate broker and auctioneer, James R. Brown, the Administrator of Elections, David Bryan, a family friend, Doyle F. Lowe, the Mayor of Sweetwater, Gene Hartman, a family friend, and Doug Watson, a Sweetwater Police Officer. Each person discussed the victim's contributions to the community and the impact of his loss. Many noted the victim's recovery from alcohol addiction and discussed the victim's creating an Alcoholics Anonymous program twenty-six years previously. John Cleveland, Sr., the victim's former attorney, discussed the victim's generosity. He said that the victim provided private loans to individuals who were unable to obtain loans from lending institutions and that the victim permitted his tenants to stay long after they were unable to pay because they had nowhere to go and no resources. He discussed his fear that the victim was lured into a trap by a telephone call requesting help. He requested the maximum sentence. Barbara Loveday, the victim's sister, discussed her tumultuous life and the problems she and her siblings encountered throughout their lives. She said that although the Defendant's life had been difficult, the Defendant did not have the right to take the victim's life and that she wanted the Defendant to receive an appropriate sentence. Emilie Gresham, the victim's niece, discussed the impact of the victim's death and his sobriety. She said the Defendant deprived the victim of his twenty-sixth sobriety anniversary, which occurred a few weeks after the murder. She discussed the pain on her mother's face each time her mother saw the victim's photograph on the news. She asked for the maximum sentence.

Michelle Miller, the victim's daughter, provided the trial court with a victim impact statement. She said the victim was known as a self-made businessman, the head of the Monroe County Republican Board, and a Monroe County election official. She discussed her love and admiration for her father and said that the victim was a recovering alcoholic and that he had been sober for twenty-four years at the time of his death. She discussed her disappointment that her eleven-year-old son would not grow up to know his grandfather. She said that her world changed forever when her father was killed and that she thought about him daily.

Vickie Miller, the victim's wife, provided the trial court with a victim impact statement. She said that after the victim's death, she had to retire from teaching elementary school because she was unable to devote all her energy to her students. She discussed the impact of the victim's death on the farm and the animals. She reminisced about the victim's morning routine and said she wanted to see him one last time. She discussed the victim's childhood on a struggling dairy farm and the victim's working hard throughout his life.

Ms. Miller stated that the Defendant robbed the victim of his life and robbed each of them of their dreams and plans to retire to their farm. She said numerous people contacted her to share their stories of how the victim helped in some way. She said the victim had full-time jobs working on their farm and for their small business, helped start Alcoholics Anonymous in the Monroe County Jail twenty-five years previously, and became the Monroe County Election Commission Chairman eighteen years previously. She discussed other notable accomplishments and asked for the maximum sentence.

Dr. Kathryn Smith testified that her trial testimony regarding the Defendant's background was limited to that necessary to support her diagnoses. She obtained the Defendant's Tennessee and Indiana Department of Children's Services (DCS) records. She said the Defendant was born into poverty with a sixteen-year-old mother, was the oldest of seven children born during an eight-year period, and was sexually and physically abused throughout her life. She said that the Defendant moved frequently as a child and lived in twenty to thirty homes by the time she was seventeen years old and that the homes had dirt floors, no electricity, and no running water. She said that often, there was not enough food.

Dr. Smith testified that DCS first investigated allegations of sexual abuse by the Defendant's uncle, Billy Joe Sturgill, when the Defendant was four years old. She said the Defendant's uncle was convicted of aggravated sexual battery. She said the Defendant's family "was notorious for . . . incest" and became angry at the Defendant for reporting the abuse. She said the Defendant was in state custody from ages eight to ten and ages fourteen to eighteen. She said parental rights termination was considered but not completed.

Dr. Smith testified that Fred Giddings was convicted of sexually assaulting the Defendant. She said the DCS records showed that the Defendant's mother asked a DCS worker if Mr. and Ms. Giddings could babysit the Defendant and her siblings when she worked third shift. The Defendant's mother was not told that Mr. Giddings was a convicted child molester. The Defendant's mother permitted the Defendant and her siblings to stay overnight with Mr. Giddings after learning this information. The Defendant reported Mr. Giddings's abuse to her mother, but her mother failed to report it and continued to send the Defendant to Mr. Giddings's home. She said one year later, the Defendant's mother's boyfriend reported the abuse. Although the Defendant denied the abuse to the social worker,

the social worker noted that the Defendant was terrified of returning to state custody and that she was skeptical the Defendant was telling the truth.

Dr. Smith testified that the Defendant acted as a mother to her siblings and was concerned about their safety when she was in state custody. She said the DCS records showed that the Defendant's mother blamed the Defendant for Mr. Sturgill's conviction. She said male relatives and Mr. Giddings gave the Defendant marijuana at age seven and directed the Defendant and her siblings to perform sexual acts on each other.

On cross-examination, Dr. Smith testified that she did not investigate the Defendant's siblings, although she knew some of them had criminal histories. She said that the Defendant had two children who lived with their father in Indiana and that the children had no contact with the Defendant's family.

Upon examination by the trial court, Dr. Smith testified consistently with her previous testimony regarding the Defendant's mental disorders. She agreed that the Defendant was chronically disturbed and that she was susceptible to suggestion and wanted to please people in order to adapt and survive. She agreed, though, the Defendant knew murder and robbery were crimes.

The trial court noted its consideration of the relevant statutory and other factors. The trial court found that statutory enhancement factors (1), (6), (10), and (13) applied. *See* T.C.A. § 40-35-114 (2010). The court found that factor (1) applied because the Defendant was previously convicted of eight misdemeanors and admitted involvement in manufacturing methamphetamine, although she was never convicted. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range."). The court found that the property loss was extensive and that the Defendant knew she was participating in a crime that "carried significant danger that someone could be injured or killed." *See id.* § 40-35-114(6) ("The . . . amount of damage to property . . . was particularly great."); *see also id.* § 40-35-114(10) ("The defendant had no hesitation about committing a crime when the risk to human life was high."). The court stated that the victim was "a valuable member" of the community and that he had a loving family. The court noted that "anytime a violent criminal offense comes before the Court, whether it involves death or serious bodily injury, we cannot forget the human suffering caused[.]" The court found that the Defendant was on probation at the time the offenses were committed. *See id.* § 40-35-114(13)(c).

Regarding mitigation, the trial court found that factor (3) applied because of the abusive childhood she suffered and because the Defendant was a victim of extensive sexual abuse. *See id.* § 40-35-113(3) (2010) ("Substantial grounds exist tending to excuse or justify

the defendant's criminal conduct, though failing to establish a defense."). Although the court found that the Defendant participated in the commission of the crimes, it found that the Defendant was not the leader of the offenses. *See id*. § 40-35-113(4) ("The Defendant played a minor role in the commission of the offense."). Based on Dr. Smith's testimony regarding the Defendant's mental health, the court found that the Defendant had a mental condition that reduced her culpability. The court noted, though, that the conditions did not interfere with her cognitive ability to understand the law or the serious nature of the offenses. *See id*. § 40-35-113(8) ("The Defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense[.]").

The trial court sentenced the Defendant to concurrent sentences of twenty-two years for facilitation to commit first degree murder, five years for facilitation of aggravated robbery, eleven months, twenty-nine days for facilitation of setting fire to personal property, and eleven months, twenty-nine days for facilitation of abuse of a corpse.

Regarding the trial court's application of enhancement factor (6), the trial court found that the property loss was extensive, although the court did not detail the facts underlying its findings. The record shows, though, that the victim's car was fully consumed by the fire. The victim's family reported it would have cost $30,000 to replace the car, and no evidence was presented disputing the value of the car. Likewise, evidence showed that the victim possessed money the day of the killing and that the Defendant and Mr. Steel possessed a large amount of money shortly after the killing. The trial court did not abuse its discretion by applying this factor.

Regarding enhancement factor (10), the trial court found that the Defendant knowingly participated in a crime that "carried significant danger that someone would be killed." The Defendant correctly states that this court has concluded that factor (10) should not be applied when the defendant's conduct puts only the victim at risk. *State v. Kelley*, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000); *see State v. Ruane*, 912 S.W.2d 766, 784 (Tenn. Crim. App. 1995). The evidence shows that the victim was the only person present who was the target of the crimes and who was placed in danger. We conclude that the trial court erred by applying this factor.

We note that although the trial court stated that the victim was "a valuable member" of the community and that he had a loving family, we conclude that this statement was not used as a basis to enhance the Defendant's sentences. Likewise, the court's statement that "anytime a violent criminal offense comes before the Court, whether it involves death or serious bodily injury, we cannot forget the human suffering caused" was an observation about the impact of violent crime. We conclude that these statements were observations by the court but were not used to enhance the Defendant's sentences.

Regarding the trial court's failure to apply mitigating factors (9) and (10), the record reflects the trial court found that the information provided by the Defendant during the investigation "was so inconsistent as to the identity of the other participants, as to lose any value - almost any value at all." *See* T.C.A. § 40-35-113(9) (2010) ("The defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses[.]"); -113(10) ("The defendant assisted the authorities in locating or recovering any property or person involved in the crime[.]").  We conclude that the trial court did not abuse its discretion by failing to apply these mitigating factors.  The record shows that although the Defendant provided information regarding who was involved in the victim's murder, she also provided numerous versions of events and implicated various people in the varying version of events, many of whom had alibis for the time of the killing and underwent polygraph examinations.  She made various statements regarding the gun's location, but the record fails to show she provided any information that led to the recovery of the weapon used to kill the victim.

Likewise, although the record shows that the Defendant provided the police information regarding the unrelated criminal conduct of Mr. Steel and Mr. Stokes, the audio recording of the conversation between the Defendant and Ms. Sullivan shows that the Defendant's motive was to provide the police enough information to justify the police's taking the men into custody until the police could determine what had occurred.  She became angry that she was in jail and the other perpetrators were not.

Our inquiry, though, does not end with the trial court's misapplication of a single enhancement factor.  The Defendant's sentence is not invalid "[s]o long as there are other reasons consistent with the purposes and principles of sentencing[.]"  *Bise*, 380 S.W.3d at 706.  The trial court correctly applied enhancement factors (1), (6), and (13).  Regarding the nature of the offense, the record shows that the victim was lured to the yellow house.  During the course of a robbery, the victim was shot three times in the head.  The victim's body was placed in the trunk of his car, and the car was set on fire.  We conclude that the record shows that the twenty-two-year sentence is within the appropriate sentencing range and "is otherwise in compliance with the purposes and principles" of our Sentencing Act.  *See Bise*, 380 S.W.3d at 709-10.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.


_____
JOSEPH M. TIPTON, PRESIDING JUDGE